COBB *v.* PARNELL.

Opinion delivered March 9, 1931.

*Frauenthal, Sherrill & Johnson,* for appellant.

*Hal L. Norwood,* Attorney General, and *Walter L. Pope,* Assistant, for appellee.

BUTLER, J.   Act No. 10 and act No. 34, amendatory thereto, were passed at the present session of the General Assembly of the State of Arkansas.   By this legislation a board was created consisting of the Governor, the Auditor of State, the Chairman of the Highway Commission, and seven others, designated as the State Agricultural Credit Board.   These acts empowered said board to issue bonds in the sum of $1,500,000, for which the full faith and credit of the State is pledged, for the purpose of financing farmers and stock raisers for agricultural

purposes. The loans are to be made by finance corpora-tions, already organized and to be created, under the supervision of the State Agricultural Credit Board according to rules prescribing the conditions under which the loans shall be made to the farmers and the manner of repayment, which rules the board are empowered to promulgate. A general annual tax of one-half mill is levied, which, when collected, shall be devoted solely to the payment of the bonds.

The reasons for the enactment of this law are to be found in the emergency clause, which is as follows: "It is ascertained and hereby declared that, owing to the terrible drouth in the State of Arkansas during the year 1930, and to the failure of more than one hundred banks in this State during the fall and winter of 1930-31 whereby several millions of dollars of deposits have been tied up, many of the farmers of the State have no means to plant a crop this year; and that, unless means are provided forthwith, many of said farmers and their families will suffer in health for want of proper food, and some may die from starvation; and it is therefore ascertained and declared that an emergency exists, and that for the immediate preservation of the public health and safety, it is necessary that this act should go into immediate operation, and be in full force from and after its passage."

In order to make the provisions of the act immediately effective, the sum of $1,500,000 was appropriated out of the funds in the State Treasury to the credit of the Highway Department, with provision that, when the bonds authorized by the act are sold the funds arising from such sales shall be immediately transferred from the credit of the Credit Board to the credit of the Highway Department, and deposited for its use to reimburse it for the amount transferred from its funds as aforesaid.

This action questions the constitutionality of the act, and the attack is made upon it on four grounds, the last two of which we shall consider first.

It is claimed by the appellant that the act is void in that no provision is made for the levying or collecting

of the tax sought to be imposed. This objection is not tenable, for the levy was in fact made by the Legislature which has the inherent authority to make the levy, and, as it is a general tax, the laws relating to the collection of State general taxes will govern.

The further point is raised that the act is unconstitutional because said act creates the board which is to carry out the purpose of the act and in the same act appropriation is also made to meet and carry into effect the purpose of the act. As stated in its title, the act is "an act to enable agriculture finance corporations to obtain funds with which to carry out the purposes of their organization, to levy a tax for the repayment thereof, and for other purposes." There is but one subject embraced in the act and it, therefore, complies with the requirements of § 30 of article 5 of the Constitution.

These objections are not seriously urged by the appellant, but it is insisted that the act is void because it violates § 1 and § 11 of article 16 of the Constitution.

Section 1, article 16: "Neither the State nor any city, county, town or other municipality in this State shall ever loan its credit for any purpose whatever; nor shall any county, city, town or municipality ever issue any interest bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the present existing indebtedness, and the State shall never issue any interest-bearing treasury warrants or scrip."

Section 11, article 16: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall distinctly state the object of same; no moneys arising from a tax levied for one purpose shall be used for any other purpose."

■ Section 1, article 16, of the Constitution is ambiguous, and for a time it was thought by some that it precluded the State from issuing any interest-bearing evidences of debt except in payment of the indebtedness existing at the time the Constitution was written.

It is a fundamental and universally recognized canon of construction that the Constitution of this State is not a grant, but a limitation, of power, and in all cases where there is not an express or necessarily implied limitation of its power by the Constitution, the Legislature is supreme; and it is always the presumption that in the enactment of a law the power of the Legislature has not been limited, and it is properly exercising its inherent authority. Therefore, a statute will be upheld unless it is clearly prohibited by the Constitution, and, where it is doubtful whether an act comes within the inhibition of the Constitution, the doubt must be resolved in favor of the constitutionality of the act. *State* v. *Crowe,* 130 Ark. 272, 197 S. W. 4; *Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9.

Although every presumption must be indulged in favor of the constitutionality of an act, some of the older decisions in States having constitutional provisions similar to the one under discussion have held that acts like the one before us were prohibited by the Constitution. The Supreme Court of Kansas had occasion to construe a statute passed by the Legislature of that State for the relief of farmers in certain areas of the State where the crops had been destroyed by drouth. This act appropriated a sum of money derived from the general revenue to be loaned to the farmers through agencies created by the act for the purpose of enabling them to buy seed and grain. The court held that the purpose for which the appropriation was made was not a public one, and that it was a loan of the State's credit in violation of the Constitution, and, after reciting the provisions of the act under review, the court said: "These various provisions show that the idea of the Legislature was not the relief of the helpless and penniless, but the assistance of a class temporarily embarrassed." *State* v. *Osawkee Township,* 14 Kan. 418, 19 Am. Rep. 99.

A constitutional provision similar to ours was considered by the Minnesota court in the case of *William*

*Deering & Co.* v. *Peterson,* 75 Minn. 118, 77 N. W. 568, construing an act of the Legislature providing for the loan of seed grain to farmers owning less than 160 acres of land and to those owning more than that amount if the land was free from mortgage incumbrance. The act was held unconstitutional on the ground that it appropriated public money for a private purpose. In commenting on the purposes of the act, the court said: ''It permits every one who has not more than 160 acres of land free from mortgage incumbrance to borrow from the State. A person might have 10,000 acres of land worth $100,000 subject to a mortgage of only $500, and he would be entitled, under the terms of this act, to borrow from the State. He might also have one million dollars worth of personal property and still he could borrow from the State. * * * Taxation cannot be imposed for a private purpose, and if the State can appropriate for a private purpose the money in its treasury and then replace it by taxation, it can do indirectly what it cannot do directly.''

As supporting the rule the cases of *Citizens' Savings' etc.* v. *Topeka,* 20 Wall. 655, 15 Am. Rep. 56; *Allan* v. *Inhabitants of Joy,* 60 Me. 124, 11 Am. Rep. 185; *Lowell* v. *Boston,* 111 Mass. 454, 15 Am. Rep. 39; and *Coates* v. *Campbell,* 39 Minn. 498, 35 N. W. 366, may be cited.

The modern doctrine, however, seems to be more elastic and liberal than the one laid down by those decisions. In the case of *Shenandoah Lime Works* v. *Mann,* 115 Va. 865, 805 E. 753, Ann. Cas. 1915C, 973, an act of the Legislature providing for the working of convicts by a board created for that purpose for the manufacture of lime and for its disposition to the citizens of the State was attacked by a number of merchants on the ground that it appropriated public funds for a private business. The court upheld the statute as a valid exercise of the police power.

For the same reason an act of the Alabama Legislature was upheld providing for the taxing of fire insur-

ance companies, the proceeds to be administered through a private association to aid in fire prevention. The court recognized that under constitutional inhibition taxes could be levied for public purposes only, and said: "The objects for which money is raised by taxation must be public, and such as sub-serve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at the first blush. * * * The purposes for which this tax is imposed are not private or individual. * * * The prevention and suppression of calamities, involving the destruction of property, peril to life, the disturbance of public security, is a governmental function and duty, aid and assistance in which it is the duty of every citizen to render. Sacred as are the rights of private property, jealous as is the law of every infringement or invasion of them, emergencies or occasions may arise in which they are subordinate and must yield to public necessity." *Phoenix Assurance Co.* v. *Montgomery Fire Department,* 117 Ala. 64, 23 S. E. 843, 42 L. R. A. 468.

Also in *State* v. *McCown,* 92 S. C. 81, 75 S. E. 392, an appropriation of State funds to create a warehouse system was upheld. The substance of the reason for the enactment of the law as stated by the court was that, by affording the farmers of the State a means of storing their cotton and borrowing money on the same under the plan set out in the act, they would be enabled to prevent the manipulation of speculators in cotton by which price of the commodity would be depressed. The attack on the statute was on the ground that it appropriated public revenues for private purposes. In upholding the act, the court said: "In passing this statute, the State was clearly within the exercise of its police power, which in its last analysis simply means the State's right of self-

defense.  *  *  *  The act in question was for a public and not a private purpose.''

In 1890 the Legislature of North Dakota passed an act which, among other things, provided that, in any county in the State where the crops of the preceding year had been a total or partial failure by reason of drouth or other cause, the board of county commissioners of such county might issue bonds of the county pursuant to the provisions of the act and with the proceeds thereof purchase seed grain for those as were in need of same and who were unable to procure it. The act further provided for a tax levy sufficient to pay the principal and interest on the bonds. Objection was made to the act on the ground that it was forbidden by the Constitution which expressly provided that the State could not lend its aid to either corporations or individuals, and that the tax was not for a public purpose. The test laid down by the court was this: ''Is the tax provided for in the statute laid for a public purpose?'' In answering this question in the affirmative, the court took occasion to say that the act was passed because of successive crop failures, a numerous body of citizens were reduced to extremities without fault on their part and so impoverished that they were unable to obtain the grain necessary for seeding the lands from which they derived the necessities of life. The court said: ''It is agreed on all sides that this class of citizens, having already exhausted their private credit, must have friendly aid from some source in procuring seed grain if they put in any crops this year. The Legislature, by this statute, has devised a measure which seems well adapted to meet the exigency and promises to give the needed relief with little ultimate loss to the county treasurer.'' After discussing certain authorities the court proceeded: ''We have carefully examined the authorities above cited, and many others of similar import, and, while fully assenting to the principles enunciated by the cases, viz, that all taxation must be for a public purpose, we do not, with the single exception of

the Kansas case (*State* v. *Osawkee Township*), regard them as parallel cases, and applicable to the question presented in the case at bar. As we view the matter, the tax in question is for a public purpose, *i. e.*, a tax for the 'necessary support of the poor'."

"This review of legislation in aid of destitute farmers will serve to illustrate the well known fact that legislation under the pressure of a public sentiment, born of stern necessity, will adapt itself to new exigencies, even if in doing so a sanction is given to a broader application of elementary principles of government than have before been recognized and applied by the courts in adjudicated cases. It is the boast of the common law that it is elastic, and can be adjusted to the development of new social and business conditions. Can a statute enacted for such broadly humane and charitable purposes be annulled by another branch of the Government as an abuse of legislative discretion? We think otherwise. Great deference is due from the courts to the legislative branch of the State Government, and it is axiomatic that in cases of doubt the courts will never interfere to annul a statute." *State* v. *Nelson County*, 1 N. D. 88, 45 N. W. 33, 26 Am. St. Rep. 609, 8 L. R. A. 283.

A cyclone destroyed a large part of the city of New Richmond, Wisconsin, killing and injuring many of its inhabitants. To bury the dead, care for the injured, clear up the debris to prevent disease, and to relieve and aid the homeless, destitute and impoverished, the city incurred large expense. Afterward it borrowed from the State out of certain funds a sum of money. At the next session of the Legislature an act was passed making an appropriation from the general fund for the purpose of relieving the city of its indebtedness. This act was attacked as unconstitutional on the ground that the money appropriate was for a private and not a public purpose. The Supreme Court of Wisconsin, in passing on this question, said: "Can we say that the appropriation in question was for a public purpose and such as subserved the common interest and well being of the people of the

State? * * * The condition of things so suddenly precipitated, the claim of humanity, and the good of the State called for immediate and extraordinary relief. In passing the act the Legislature were called upon to consider the whole situation. The people of the commonwealth were bowed in sorrow over the great calamity, and the call was for the immediate exercise of the police power of the State on a large scale. The object of the act being public, and to subserve the common interest and well-being of the people of the State at large, brought the subject legitimately within the power of the Legislature." *State ex rel. New Richmond* v. *Davidson,* 114 Wis. 563, 88 N. W. 596, 58 L. R. A. 739.

The Constitution of the State of Montana provided by § 1 of article 13 that "neither the State, nor any county, city, town, municipality, nor any other subdivision of the State shall ever give or loan its credit in aid of, or make any donation or grant by subsidy, or otherwise, to any individual association or corporation." The Legislature of that State passed an act, the outstanding purpose of which was to furnish aid in the shape of seed grain to needy farmers who could not procure the same, and authorized the issuance of bonds to procure money for the purchase of seed grain, and provided that those obtaining the grain should sign a contract for the repayment of the cost with six per cent. interest. This act was attacked as being in violation of the section of the Constitution quoted above and because it was not for a public purpose. It was stated by the court that "public authorities may not do by indirection what they cannot do directly; and forasmuch as the bonds or warrants authorized by this act to be issued and sold must, to the extent that repayment fails or is delayed, be made good by taxation, it is entirely clear that their issuance cannot be authorized save for a purpose for which taxation is lawful. Hence the rule that taxes may not be laid except for a public purpose is properly invoked. May this be considered such a purpose? That depends on what is meant by 'needy farmers who are unable to pro-

cure seed'; for, vast and important as farming operations are, and worthy as they may be of such public encouragement as many of our statutes do authorize, still, as such, they are private and not public. * * * Now, to the farmer, unfavorably situated, drouth, hail, or other causes of crop failure may entail results equally ruinous and not different in character from those of pestilence or fire; they may drive him to the verge of the poorhouse, and he becomes, as the victim of misfortune, a person with claims upon the sympathy and aid of society—the more so as he is unwilling to become wholly dependent—for which the county may and must provide. If, therefore, the phrase 'needy farmers who are unable to procure seed' may be taken to mean persons engaged in agriculture who, by natural or other conditions beyond their control, are so reduced in circumstances that they have neither money, nor credit, nor property, in shape to be pledged or mortgaged, and who without some aid will become paupers, dependent on the county for support—and we think this is the meaning—then the purpose to aid them is a public one, and the only subject left to consider is the validity of the means prescribed. * * * If any course proposed is a measure of poor relief and is prescribed by law, there is no contravention of § 1, article 13, even though it should involve a loan or a donation. As a matter of fact, the origin and purpose of the restrictions in § 1, art. 13, are well known. They arose in a time when the evils of public aid to railroads were notorious; they were intended to prevent the extension of such aid to either individuals or corporations for the purpose of fostering business enterprises, whether of a semi-public or private nature; they had and were designed to have no reference whatever to suitable measures, elsewhere commanded, for the relief of the poor.'' *State* v. *Weinrich,* 54 Mont. 390, 170 Pac. 942.

In construing § 1, art. 16, of our Constitution, this court refused to accept the narrow view taken by some that the credit of the State could not be pledged

for any purposes, for it had in mind the history of the times just preceding the adoption of the Constitution and the evils sought to be corrected. Among the evils were precisely those mentioned in the case of *State* v. *Weinrich,* 170 Pac., *supra.* The State had just been liberated from the domination of alien adventurers who, under the guise of fostering the industries of the State by lending to them credit, had looted the treasury. A notable example of unwarranted and improvident loans of the State's credit was the aid given to the building of railroads. That it was only to prevent a recurrence of this that § 1, article 16, was adopted was apparent from the fact that at the first session of the Legislature after the adoption of the Constitution of which article 16 is a part, the Legislature passed an act providing for the issuance of bonds as noted in the case of *Hays* v. *McDaniel,* 130 Ark. 52, 196 S. W. 934. Since that time the credit of the State has been used for the promotion of the general welfare of the State and appropriations made from revenues derived from general taxation for the purposes of protecting the State from disease, from hazards by fire, and for exhibiting the resources of the State at various expositions, the design of which was to attract immigration and to secure the development of our own resources. Therefore, it has become recognized that the State, although prohibited from lending its credit in the furtherance of private enterprises, may still use that credit for the promotion of the common good. *Hays* v. *McDaniel, supra; Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9, *supra.*

The question then presented for our consideration is this: Is the purpose and effect of the act now before us a loan by the State of its credit to foster individual enterprises, or is it one which has for its end the accomplishment of a purpose which will secure the State from a general threatened evil and promote the welfare of its citizens? In other words, is it for a public purpose?

These are the circumstances which called into existence the act in question, to which reference is made in

its emergency clause. A great drouth prevailed in the State of Arkansas throughout the entire growing season of 1930 which caused in the greater part of the State, the entire failure of corn, the principal grain grown, and all other crops except cotton; while cotton is among the most drouth resistant of plants, many parts of the State made less than one-tenth of the normal crop, and except in a few favored localities, small in area, the cotton was not more than 50 per cent. of a normal yield. The total production of cotton for the State was less by approximately 500,000 bales than the year preceding, and was produced at a cost based on normal production and an average price of twenty cents. About the time of the maturity of the crop prices of cotton began rapidly to decline, and, when farmers began to harvest and market the crops, its value was not more than half the price per pound obtained for the crop of 1929. This gave the farmers, according to locality, from one-twentieth to one-fourth of a normal return for their expenditures in making and gathering the crop; and as it was made on borrowed money, the vast majority of farmers were unable to pay but a fraction of their debts, for the payment of which all they had stood pledged. Therefore, they faced another year without food for man or beast, heavily burdened with debt, and their securities exhausted. To add danger to this situation, twenty-one of our sister States had suffered severely from the effects of the drouth, though in none of them was the drouth so complete and prolonged as with us, and, to complete the burden of calamity, an economic depression obtained throughout the nation, more pronounced perhaps than ever before in history, and, largely because of this, together with the failure of crops, late in November, 1930, the largest bank in the State closed its doors. Immediately before, or soon thereafter, bank after bank throughout the State became insolvent and went into liquidation until more than one hundred banks, within a space of three months, had closed their doors, thus rendering unavailable a major part of the liquid capital of the State. The farmer had

already mortgaged, for debts he could not pay, all he had, and could borrow no more. This was the plight of vast numbers of men and women when winter closed down. The larger landowners, the merchants, the banks to whom they were accustomed to go for help were themselves bankrupt, or their credit exhausted. What money the thrifty and careful had hoarded was locked behind the doors of insolvent banks and dreadful, sudden poverty gripped the State within all her borders. Relief from private sources at home was pitifully inadequate, and, but for aid from without, thousands of our people would have already starved. That everready agency of a benevolent people, the society of the Red Cross, came to the succor of our distress with the utmost speed and generosity. The extent of the aid needed and furnished is almost beyond belief. In many of the counties and in some—naturally the most productive—a majority of the entire population was provided with means of subsistence, and in one, out of a population of some 22,000, it was necessary that more than 20,000 be given aid, and in practically every county except possibly two or three of the 75 counties, a considerable number of the people have been maintained by the Red Cross.

Our accredited representatives in both houses of the National Congress, have entreated, in the most moving terms and with some measure of success, aid from the Government of the United States, but with all this the measure of relief is still insufficient, and the people, though saved from immediate starvation, are now undernourished, and with vital forces so depleted as to be unfit to perform hard physical labor and are subject to the inroads of disease.

With measures of relief still insufficient, the Legislature now in session, passed the acts which we have under consideration. The plight of our citizens, most feebly and inadequately here described, was the motive moving our General Assembly—the relief of a people wholly destitute and utterly helpless its aim and purpose.

It will be seen by a review of the cases heretofore cited that under constitutional inhibition like or analagous to ours, aid has been extended by the State under varying circumstances, to ward off anticipated dangers, or relieve present calamities; and, even in those cases denying the authority of the State to lend its aid, the intimation is that statutory relief was denied not so much for lack of power, but rather that the power was improvidently exercised and without sufficient reason.

But, even under the view prevailing a half century ago of the limits of legislative power, when the case of *State* v. *Osawkee Township,* 14 Kan. *supra,* was written, we are justified, from the language there used in the opinion, that had the people of Kansas been suffering under so wide-spread an irremediable catastrophe as are now the citizens of Arkansas, the decision would have been quite otherwise, for there it was said: "The relief of the poor, the care of those who are unable to care for themselves, is among the unquestioned objects of public duty. In obedience to the impulses of common humanity, it is everywhere so recognized. * * * Something more than poverty, in that sense of the term, is essential to charge the State with the duty of support. * * * It is not one who is in want merely, but one who, being in want, is unable to prevent or remove such want. There is the idea of helplessness as well as of destitution. We speak of those whom society must aid, as the dependent classes, not simply because they do depend on society, but because they cannot do otherwise than thus depend. * * * It matters not through what the inability arises, whether from age, physical infirmity, or other misfortune; it is enough that it exists."

The case of *William Deering & Co.* v. *Peterson,* 75 Minn. 118, 77 N. W. 568, is a case as we have already seen which held unconstitutional an act for the purchase and distribution of seed grain to farmers. But the conception of the State's duty had broadened, and there it was said: "The cases of *Lowell* v. *City of Boston,* 111

Mass. 454 [15 Am. Rep. 39]; and *State* v. *Osawkee Tp.*, 14 Kan. 418 [19 Am. Rep. 99], are much in point. The latter case holds that no one can obtain such public aid unless he is actually a pauper, however imminent and immediate the danger of his becoming such. It may be that, if this question were before us, we would not go thus far, but would hold that, in the midst of such a great public calamity, a person who is within one degree of being a pauper, and in imminent and immediate danger of becoming such, may, for the purpose of preventing him from becoming such, be given aid by the State or municipality without violating the Constitution."

Again we say, in none of the cases either upholding or denying the right to aid was there such general destitution and complete helplessness as exists now in this State and which moved the Legislature to action. Through the leaders of the State we have applied to the Red Cross for aid, and our cry has been heard and heeded; through our representatives in Congress a measure of relief has been granted. While the private resources of the citizens of this State are exhausted, the credit of the State itself is not, and now to say, because of a narrow and scholastic interpretation of our Constitution that the State is unable itself to give what measure of relief it can is a comtention to which we cannot assent. We think the need is great, and the means for its relief but a use of the credit of the State for its own protection, as, protecting its citizens from famine and disease, it protects itself, and the aid extended is for a public purpose. The protection of its citizens from danger of whatever kind is the duty of the State and in this case the measure is but a valid exercise of the police power and the means employed finds ample justification in the maxim "The safety of the people is the highest law."

The landowners in many sections of this State had become heavily burdened by taxes placed by themselves upon their lands for the construction of local improvements. It was feared that they would be unable to pay these taxes and therefore would lose their lands. These

improvements were not made for the benefit of the citizens of the State as a whole, although they might indirectly inure to the general benefit, but because of the theory that the improvement would enhance the value of the land taxed. But, notwithstanding this, the State recognized that a considerable number in the State could not suffer without great hurt to the whole, and issued its bonds for their relief. The act of the Legislature authorizing the issuance of the bonds was sustained in the case of *Bush* v. *Martineau, supra,* on the theory that the State was not loaning its credit, but using it for a public purpose, in that the poverty of many would injure the prosperity of all. If it was a public duty to relieve a large number of our citizens from a burden of taxation improvidently assumed by themselves and for their own benefit, and the act sustained as the use of the State's credit for a public purpose, then where a law is enacted for relief from certain starvation and probable disease, certainly it, too, must be but the use of the State's credit for a public purpose. This we so hold as consonant with the impulses of common humanity and natural justice, our conclusions finding support in the authorities we have cited and reviewed. The doctrine announced in this case has no application except in cases where the calamity is certain and irremediable in its nature and general in its scope.

The last objection raised is that the act violates the provisions of section 11, article 16, because it diverts funds belonging to the Highway Department and levied for the construction of roads to the credit of the State Agricultural Credit Board. To this contention we do not agree, because there was no diversion. The section in question by the use of the word "diversion" evidently meant a permanent taking from one fund to the use of another and did not mean a temporary transfer of the funds as in this case. Funds are not to be diverted, but to be transferred temporarily with adequate means for their return provided.

Our conclusion, therefore, is that the act before us must be upheld as not in violation of §§ 1 and 11 of article 16 of the Constitution, but as a use by the State of its credit for a public purpose and a valid exercise of its general police power. The decree of the trial court is correct, and it is therefore affirmed.

HART, C. J., (dissenting). It seems to Judge SMITH, Judge MEHAFFY and me that this is a case which calls for the application of the old and often quoted maxim that hard cases make shipwreck of the symmetry of the law.

Article 16, § 1, of our Constitution provides that neither the State nor any city, county, town or other municipality shall ever loan its credit for any purpose whatever. In the construction of this provision, the court has held that it prohibits the making of loans for private purposes by the State, either directly or by delegation of power. *Hayes* v. *McDaniel,* 130 Ark. 52, 196 S. W. 934; and *Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9.

In the case first cited, the money was borrowed and the bonds issued to cover deficiencies in the General Revenue Fund, and a tax was authorized to be levied to create a sinking fund for the payment of the principal and interest of said loan. The primary object of all taxation is for the support of the government, and there would seem to be no room for doubt that a loan for supplying a deficiency in the taxes collected for the support of the State government was for a public purpose. The loan proposed to be secured and the bonds issued in the case last cited were for the payment of certain obligations incurred by road improvement districts and other governmental agencies created for the purpose of constructing improved roads, and for constructing new improved roads by the State itself. This was for a public purpose. Highways are constructed and maintained for public use by the State itself or by governmental agencies created by law for that purpose. The making and maintaining of public highways has always been held to be governmental, and it has been recognized as one of the

most important duties of the State to provide and repair them. Therefore, public highways are for public uses, and there is no reason why the power of taxation by the State may not be exercised in their behalf.

It is elemental that taxes can only be levied for a public purpose. Indeed, there is no principle of constitutional law better settled than that taxes can not be levied for a private purpose. This brings us to a consideration of whether the present act is the loan of the credit of the State for a private purpose. Both the original act and the amendment thereto pledge the full faith and credit of the State for the payment of the bonds proposed to be issued. This shows that the State is lending its credit to whatever purpose for which the bonds are issued.

"If the State can not loan its credit, it can not borrow money on its own bonds, and then loan the money. It can not do indirectly what it can not do directly." *During* v. *Peterson*, 75 Minn. 118, 77 N. W. 568.

It is true that the Governor, State Auditor, and Chairman of the Highway Commission are created as a board to carry out the provisions of the act. This does not make any difference. "The right to tax depends upon the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers; and the people may be taxed for a public work, although it may be under the direction of an individual or private corporation." *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 147; and *Coates* v. *Campbell*, 37 Minn. 498, 35 N. W. 366.

It is true that there is no hard and fast rule by which to determine which purposes are public and which private. *People* v. *Salem*, 20 Mich. 452. Judge Campbell in a concurring opinion at page 495 said: "It can not be claimed that there is no limit to the power of taxation, which can

prevent the imposition of taxes for all purposes which the Legislature may choose. There are purposes the illegality of which would be so manifest that, although not mentioned in any Constitution, no one could hesitate to say the burden was not validly imposed to further them. The purposes for which taxes are imposed must be public purposes, and however close things may be to the dividing line, yet whenever any subject lies clearly on one side or the other, the courts must sustain or reject the tax accordingly, whether the purpose be laudable or not.''

This means that the power of taxation can not be resorted to in aid of any class in business, although it might promote general prosperity. The reason is that taxation is only lawful to enable the State to fulfill its public duties, and to tax the people to pay the expenses of public business.

By section 5 of the original act, the board created by the act was empowered to make loans from the fund provided for the purpose of purchasing capital stock in corporations organized for the purpose of financing farmers and stock-raisers for agricultural purposes. The section provides that the loans shall be evidenced by the note of the individuals, secured by an assignment of the stock so purchased, etc. The section further provides that preferences shall be given borrowers subscribing stock in finance corporations already organized rather than in corporations hereafter organized. The aggregate loans to counties are fixed not to exceed $50,000, and to individuals not to exceed $2,000. In the amended act it is provided that the loan to any one individual shall not exceed $5,000. Thus, it will be seen that the act by its terms does not propose to be a measure of poor relief, but only to lend to the needy to keep them from becoming objects of charity.

Once the agencies of taxation are operated to anticipate further want, no one can foretell what the ultimate result will be. It is the character of the use, and

not the number of persons affected, that makes a public or a private purpose. Otherwise, by insensible degrees, sanctioned by judicial approval, subsequent Legislatures, swayed by the misfortunes of the people of the State, might be carried step by step into the exercise of illegal powers of taxation without perceiving the progression.

The cardinal rule for the interpretation of statutes is the ascertainment of the meaning of the language used in the statute, and not what the lawmakers themselves meant. *State* v. *Trulock,* 109 Ark. 556, 160 S. W. 516.

As we have already seen, taxation is the means of raising revenue for public purposes. Section 3 of the amended act expressly provides that the Credit Board is empowered to make loans to individuals for the purpose of purchasing capital stock in corporations proposed to be organized in the various counties to finance farmers and stock-raisers. The section further provides that preferences shall be given to borrowers subscribing stock in corporations already organized, and that no loan shall be made to any individual to exceed the sum of $5,000. Section 5 provides for incorporation of these credit corporations under act 250 of the Acts of 1927, regulating the organization of business corporations. The language used shows that a loan of money is contemplated from funds ultimately to be collected by taxation.

If, as we have already seen, the term "public purpose" has no relation to the urgency of the public need, but is merely a term of classification to denote the objects for which the State is under the duty to provide, we have an act to loan the public money, not to persons who are classified in law as poor persons for whom it is the duty of the State to provide, but to persons who may need as much as $5,000 to carry on their farming operations for a single year. If this be a public purpose and their farming operations end disastrously and the loan becomes too burdensome, then a subsequent Legislature might provide for the release of the borrowers from any further obligations on bonds issued under the provisions

of the act, just as was done when the bonds issued by the various road improvement districts became too burdensome to bear. The Legislature alone may declare the public policy of the State with reference to taxation, and the courts have nothing to do with the wisdom and expediency of its acts, when done within constitutional limitations. It is the duty of the courts, however, to act when the Legislature attempts to levy taxes for uses that are usually classified in law as private purposes.

Owing to the public importance of the question, we have deemed it proper to express our dissent in writing, and to express the view that the Legislature might make an appropriation of the public money for those who may now be properly classed as poor persons, but not to loan its credit to individuals to prevent them from becoming a charge on the public.

The views we have expressed render it unnecessary to consider the remaining questions raised by the appeal.