In Re OPINION OF THE JUDGES

(240 N. W. 600.)

(File No. 7393. Opinion filed February 6, 1932.)

Opinion of the Judges in response to a communication of the Governor of South Dakota.

To His Excellency, The Governor of The State of South Dakota:

Sir: We have the honor to acknowledge your communication of yesterday wherein (pursuant to the authority of section 13, art. 5, Constitution South Dakota, permitting you to ask the opinion of the judges of this court upon important questions of law involved in the exercise of your executive powers and upon solemn occasions) you request the judges to answer the following questions:

"1. Can the legislature enact legislation which would enable the State thru its proper officers or agencies to appropriate any part of the money now on hand or hereafter raised by motor vehicle fuel sales taxation toward furnishing aid in the form of feed or feed loans to the citizens who may need same for carrying their livestock thru the winter?

"2. Can the legislature enact legislation which would enable the State thru its proper officers or agencies to appropriate any part of the money now on hand or hereafter raised by any form of taxation toward furnishing aid in the form of feed or feed loans to the citizens who may need same for carrying their livestock thru the winter?

"3. Can the legislature enact legislation which would enable the State thru its proper officers or agencies to appropriate any part of the surplus funds of the State which now may be on hand

in various sinking funds or other public appropriations which are not immediately necessary for other state purposes toward furnishing aid in the form of feed or feed loans to the citizens who may need same for carrying their livestock thru the winter?

"4. Could the legislature enact legislation which would permit the several counties as a county enterprise to raise funds either by supplemental budget or bond or warrant issues with which they in turn might furnish feed loans or even distribute feed as a part of a county poor relief system, similar to the statute we now have relating to seed grain furnished by counties, and insect eradication aid furnished by counties?"

You have presented to us in connection with your inquiry a copy of an opinion rendered to you under date of February 4, 1932, by the Attorney General, advising you that public moneys now on hand could not legally be diverted from the purposes to which they have already been duly appropriated and for which the taxes raising such moneys were levied, and further advising you that the personnel of his office, after expending considerable time in individual research and conference, had been "unable to find any legal means provided by law whereby the state or its governmental subdivisions can expend public funds for the purposes mentioned in your request."

A proper deference and respect for the dignity and ability of the Legislature as a co-ordinate department of the state government renders us extremely hesitant to undertake to announce in advance of legislative action the precise limits within which we think any contemplated action should be confined in order to be valid under the Constitution of this state. We should and do assume that the Legislature in any action which it might undertake would be entirely aware of the constitutional limitations established by the people of this state and would not transgress them. It is as impossible for you as for us to know whether or not, if the Legislature were now in session, the requisite majority of the members thereof would either attempt or desire to enact any legislation such as your questions inferentially present. If a legislature should desire to accomplish the objects suggested in your inquiries, or any of them, the language and form of the statute which might be enacted to that end are entirely unpredictable. The

difficulties of attempting to pronounce upon the constitutionality of a statute possible to be enacted in futuro, with no means of knowing the language wherein it might be phrased or the precise method by which the object sought might be attempted to be provided for, are readily apparent.

We have deemed it our duty, however, to attempt as best we can a general answer to your inquiries, and we beg leave to state our ultimate conclusions and opinion in response to your questions thus: In view of the restrictions and limitations imposed by the Constitution of South Dakota, we have been entirely unable, upon careful study and consideration to perceive any method or means whereby it would be possible for the Legislature of this state (in the event it might desire so to do): validly to enact any legislation which would accomplish the ends suggested in your inquiries or any of them.

We are compelled to this conclusion by the views we entertain with reference to certain legal and constitutional questions necessarily involved in considering the validity of any proposed legislation along the lines suggested, whatever might be the precise form thereof, which views we outline as follows:

First, and by way of preliminary, we may say that, in our opinion, the tax upon motor vehicle fuels is merely one of many conceivable forms of taxation. We can see no legal distinction, so far as concerns the purposes for which the tax may lawfully be levied or the proceeds thereof appropriated, between the motor vehicle fuel tax and any other tax, and in discussing this precise point on a previous occasion the judges said: "It is our opinion that moneys which may be derived from this particular type of taxation stand in no other or different position than moneys derived from any other form of taxation, as, for example, a general property tax." Opinion of the Judges, 50 S. D. 324, 210 N. W. 186, 187.

We are therefore of the opinion that your first and second inquiries are, in substance and legal effect, precisely identical.

Secondly, and with particular reference to the possibility of employing moneys (either state or county) now on hand or to accrue under present levies, for the furnishing of feed or making of feed loans, article 11, § 8, Constitution of this state, provides:

"No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which the tax only shall be applied."

Under this section we are of the opinion that moneys now on hand (or hereafter to be received) as the result of payment of taxes (whether motor vehicle fuel tax or other tax) already levied, and the proceeds of which have already been appropriated, must be applied to the purposes for which they were levied and to which they have already been appropriated, and we think the same could not now be diverted, even by legislative action to any other purpose. See Opinion of the Judges, 50 S. D. 324, 210 N. W. 186; White Eagle Oil & Refining Co. v. Gunderson, 48 S. D. 608, 205 N. W. 614, 43 A. L. R. 397.

█ This same constitutional provision would prevent the diversion of money in existing sinking or other funds raised by taxation from the specific purposes of such funds to the making of feed loans, even though the money is now on hand and the expenditure thereof is not immediately required for the particular object for which it was levied and appropriated.

Thirdly, and with reference more particularly to the question of whether future taxes (either as a general tax, or as an excise tax upon motor vehicle fuels, or otherwise) might be validly imposed by legislative authority, either by the state or by counties, and the proceeds thereof used for feed or feed loans for individuals, or to recoup and replenish a fund created by bond issues or tax anticipation warrants and used for feed or feed loans in advance of the actual receipt of taxes, we come to the broad general question of whether the furnishing of feed or feed loans to individuals is, under the Constitution, a proper purpose for which taxes may be levied or public money, state or county, expended. We may state here that the furnishing of aid to individuals or communities by the federal government depends upon congressional action, not subject, of course, to restrictions imposed by the state Constitutions, and primarily dependent upon substantially different legal principles. The fact that Congress, under certain circumstances, may lawfully make provision for such aid out of federal funds is not helpful, therefore, in determining whether the Legislature may constitutionally authorize the state or counties to do likewise.

■ It is a fundamental rule that the Legislature cannot expend the money of the state, nor authorize governmental subdivisions to expend their money, excepting for public purposes. This rule is recognized by the provision of section 2 of article 11, Constitution South Dakota, that taxes "shall be levied and collected for public purposes only."

■ ■ It lies within the province of the people of any sovereign state to say, by their direct voice in the Constitution, what shall constitute a public purpose in that state, subject only to such limitations as may be imposed by the Constitution of the United States. State v. Board of Com'rs of Beadle County, 53 S. D. 609, 222 N. W. 583. Pursuant to the power in them vested, the sovereign people of South Dakota by constitutional amendment have declared many things to be "public purposes" in this state which otherwise might well fail of being so considered. There is, however, no constitutional declaration that furnishing of feed or feed loans to individual stockraisers is a public purpose, and, in the absence of any specific constitutional declaration, the determination of whether this is, in fact and law, a public purpose, is in the first instance for the Legislature, and ultimately for the courts.

■ The phrase "public purpose" in this connection is doubtless impossible of precise definition. Its content changes to some extent from time to time with the economic and social development of the community. A carefully reasoned consideration of the subject at considerable length will be found in Cooley on Taxation (4th Ed.) §§ 174-222. It seems, however, the clear weight of authority that the aiding of individuals in their business enterprises even in time of disaster and distress (contradistinguished from public support of paupers) is not a public purpose.

"The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and

not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary." Lowell v. City of Boston, 111 Mass. 454, 15 Am. Rep. 39.

"For reasons unnecessary here to recount, in some portions of the state last season there was a total, and in others a partial, failure of the crops. It was generally understood that many farmers would come to this spring's sowing with little or no seed, and with stock weakened for lack of grain. To make good this lack is the evident purpose of the act,—to provide grain for seed and feed. Its aim is not to furnish food to the hungry, clothing to the naked, or fuel to those suffering from cold. It is not the helpless and dependent whose wants are alone sought to be relieved. If it were, the fact that many who are neither helpless nor dependent might obtain assistance through its administration, would be no valid objection to the constitutionality of the law. It contemplates a class who have fields to till and stock to care for, and purposes to help them with seed for their fields, and grain for their stock, that thus they may pursue with better prospects of success their ordinary avocations. It taxes the whole community to assist one class, and that, not for the purpose of relieving actual want, but to assist them in their regular occupations. These people are engaged in the business of farming. This business cannot be successfully carried on without seed, nor without stock strong enough to do the ordinary work. They are destitute of seed, and their stock require grain. Hence the tax upon the community. The principle would be the same if their supply of grain was sufficient, but, through the prevalence of the epizooty, or some other disease, their stock had all died. Could a tax be sustained to purchase stock for their ordinary farm work? Or, again, suppose some prairie fire, driven by a fearful wind, sweeps through a county, consuming its fences and farming tools, can a tax be sustained to supply this loss, and enable the farmers to prosecute their labors? Nor need the inquiry be limited to a single class. Were the carpenters or shoemakers, or any other industrial class, located

in a separate quarter of a city, and their tools and stock in trade swept away by fire, could a tax be sustained to purchase new sets of tools, and new stock in trade, to enable them to reprosecute their business, and secure support for themselves and families? No distinction in principle can be made between these different supposed cases and the case at bar. They all rest upon this proposition: that a tax is laid upon the public to furnish to one class the means of carrying on its regular occupation. * * * Grant that these parties are not now helpless and dependent; that they are not a public charge. Unless they are able to make and harvest a crop they may become so the ensuing winter. Is it not the part of wisdom to expend a little now to purchase seed and feed, rather than run the risk of having them become paupers hereafter? Under the peculiar circumstances of this case, this argument is a strong one. We are not disposed to belittle the magnitude of the calamity, or make light of the hardships of those upon whom it has principally fallen. If we consulted simply our own feelings, we should gladly approve of this as of every effort to mitigate the severity of the blow. But though this calamity is great, and though by reason thereof it may seem wise to appropriate out of the public funds a little now to guard against the risk of future want, yet the principle is dangerous and unsound." State v. Osawkee Tp., 14 Kan. 418, 19 Am. Rep. 99.

In further support of this view see Mackey v. Reeves, 42 S. D. 340, 175 N. W. 359; Deering & Co. v. Peterson, 75 Minn. 118, 77 N. W. 568; Allen v. Inhabitants of Jay, 60 Me. 124, 11 Am. Rep. 185; Feldman & Co. v. City Council of Charleston, 23 S. C. 57, 55 Am. Rep. 6; Patty v. Colgan, 97 Cal. 251, 31 P. 1133, 18 L. R. A. 744; Auditor of Lucas County v. State of Ohio ex rel. Boyles, 75 Ohio St. 114, 78 N. E. 955, 7 L. R. A. (N. S.) 1196; Citizens' Sav. & Loan Ass'n v. Topeka, 20 Wall. 655, 22 L. Ed. 455.

We are aware of a holding which appears to be to the contrary in State v. Nelson County, 1 N. D. 88, 45 N. W. 33, 8 L. R. A. 283, 26 Am. St. Rep. 609. We think, however, that the case is opposed both to the better reason and to the weight of authority. In addition it is bottomed expressly and affirmatively on the precise language of section 185, Constitution of North Dakota (identical with the language formerly contained in article 14, § 1, Constitution of South Dakota), which language has been entirely ab-

sent from the Constitution of this state ever since the amendment of Constitution South Dakota, article 13, § 1, in November, 1918, pursuant to chapter 163, Laws 1917. The case, therefore, cannot be deemed an authority as our Constitution now stands.

Upon all these considerations (and especially by reason of our view upon the point last dealt with, which in itself is essentially decisive upon all the questions you propound), we have been forced to arrive at the ultimate conclusion and opinion hereinbefore set forth.

Judge ROBERTS of this court, being absent because of illness, has been unable to participate in the consideration of your inquiries.

We have the honor to remain, sir,

Yours very respectfully,

DWIGHT CAMPBELL,
Presiding Judge.
SAMUEL C. POLLEY,
FREDERICK A. WARREN,
HERBERT B. RUDOLPH,
Judges of the Supreme Court.