314 P.2d 714

The STATE of New Mexico on the Relation of Edwin L. MECHEM, Governor of the State of New Mexico and President of the State Board of Finance, Petitioner,

v.

J. D. HANNAH, State Auditor of New Mexico, and Joseph B. Grant, State Treasurer of New Mexico, Respondents.

No. 6239.

Supreme Court of New Mexico.
Aug. 8, 1957.

Rehearing Denied Sept. 11, 1957.

---

Melvin T. Yost, Santa Fe, for petitioner.

Fred M. Standley, Atty. Gen., Santiago E. Campos, Asst. Atty. Gen., for respondents.

McGHEE, Justice.

The relator as Governor of New Mexico seeks a peremptory writ of mandamus to compel the respondents as State Auditor and Treasurer respectively to make available to the State Board of Finance $200,000 appropriated in section 1 of chapter 22 of the Session Laws of 1957, and approved Feb. 25, 1957. They had refused to make the money available following an opinion by the Attorney General that the law was probably unconstitutional.

The purpose of the appropriation was to pay in part the state's share of emergency hay and roughage certificates issued to live-stock owners as contribution to be used by the recipient livestock owner in the purchase of hay for their foundation herds of livestock in cooperation with the United States Department of Agriculture. Former Governor John F. Simms, on Sept. 13, 1956, contracted with the Department of Agriculture of the United States that New Mexico would contribute $2.50 per ton for hay purchased by certificate holders approved by officials and committeemen named by officials of the United States Agricultural Department, and that the United States would contribute $7.50 per ton. The contract was dated Sept. 13, 1956, and provided for a maximum contribution by New Mexico of $75,000, and by the United States of $225,000.

On Oct. 3, 1956, the contract was amended to provide for a maximum contribution by New Mexico of $225,000, and by the United States of $1,225,000. However, without any apparent change in the contract certificates were issued until a total of $2,325,000 worth were put out, and the state's share of the program reached the sum of $581,000 of which it has paid $179,000 out of money made available by its Board of Finance.

The occasion for the hay program was the fact that New Mexico had been afflicted by a severe drouth in almost all counties for a period of six years, so that its ranges were denuded in almost every section, and the livestock industry was in distress, as evidenced by the stipulation entered into by the parties in part as follows:

"1. That drought conditions existed in general in New Mexico from 1950 through 1956.

"2. That conditions of range lands, due to continued drought, deteriorated

in general throughout the state from 1950 to 1956, and that by 1956 the drought had reached disaster proportions.

"3. That the numbers of livestock and basic herds of livestock in New Mexico had been reduced due to drought conditions during the years of 1950 through 1956, and that there was, accordingly, a substantial reduction of income from the raising of livestock.

"4. That 4,767 livestock raisers were issued certificates under the drought program.

"6. That the livestock industry is a basic and essential industry to the economy of the State of New Mexico.

"7. That the Governor of the State of New Mexico and the State Board of Finance during the year 1956 recognized that a disaster existed due to drought and requested the President of the United States to declare the State a disaster area, and that thereafter the President of the United States during the year 1956 declared the State of New Mexico to be a drought area.

"8. That the standards of eligibility for participation in the Roughage Program, * * * did not limit participation in the Program to persons who were "sick and indigent" within the meaning of the proviso contained in art. IX, § 14 of the Constitution of the State of New Mexico."

Under the agreement New Mexico in addition to the contribution of $2.50 per ton was to keep the books and records, and pay the $10 per ton through its fiscal agent, the First National Bank of Santa Fe, honoring the certificates and the draft thereon, and in turn collecting the share of the United States, thus creating a revolving fund.

The eligibility of persons applying for the certificates was determined by committee members in the various counties who were appointed by officials of the Department of Agriculture of the United States who had the direction and control. New Mexico had no voice in the issuance of the certificates to applicants.

It was to meet the state's share of outstanding certificates that Chapter 22 was enacted.

Depositions were taken from a number of livestock owners and others familiar with problems brought on by the extended drouth, and all testified the hay program was essential to the preservation of the livestock industry in New Mexico, and that the state's contribution was of great help.

Applicants were required to certify that they could not carry their foundation herds (breeding stock) without help from the emergency funds, and there was no distinction except as to the amount of help given between one with fifty head and one with

one thousand or more. There was no requirement that any of the foundation herd be diminished but an applicant was required to report on the amount of feed on hand or that he would likely have, and that he was financially unable to purchase feed needed for his herds; also it was required that he had devoted at least fifty percent of his time to the livestock business or received fifty percent of his income from it. All counties in New Mexico except Los Alamos were in the disaster area. There was no previous legislation authorizing New Mexico's participation in the program.

The respondents make the following points in their attempt to justify their refusal to make the $200,000 available for the retirement of the state's share of certificates, the United States having already paid its part:

"Chapter 22, New Mexico Session Laws of 1957, and the 'Federal-State Cooperative Agreement for Roughage Program in the State of New Mexico' authorized thereunder contravene the provisions of article IX, section 14 of the Constitution of the State of New Mexico in that the grants of money to participants in the roughage program constitute donations to or aid of persons, associations or public or private corporations.

"Chapter 22, New Mexico Session Laws of 1957, and the 'Federal-State Cooperative Agreement for Roughage Program in the State of New Mexico', authorized thereunder, contravene the provisions of article IV, section 31 of the Constitution of the State of New Mexico in that the appropriation made therein, the administration of the said program and those persons or corporations for whom the appropriation is made and the program instituted for are not under the absolute control of the court."

Article IX, section 14 of the Constitution of New Mexico reads:

"Neither the state, nor any county, school district, or municipality, except as otherwise provided in this Constitution, shall directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person, association or public or private corporation, or in aid of any private enterprise for the construction of any railroad; provided, nothing herein shall be construed to prohibit the state or any county or municipality from making provision for the care and maintenance of sick and indigent persons."

Chapter 22, reads:

"An Act making appropriations to the state board of finance for the 'Federal-State Cooperative Agreement for the Roughage Drouth Feed Program'; and declaring an emergency.

114

"Senate Bill No. 180; Approved February 25, 1957

"Be it Enacted by the Legislature of the State of New Mexico:

"Section 1. There is appropriated from the state general fund to the state board of finance the sum of two hundred thousand dollars ($200,000), or as much thereof as may be needed, for the use during the remainder of the forty-fifth fiscal year and the forty-sixth fiscal year, for use under the 'federal-state cooperative agreement for the roughage drouth feed program,' provided that no part of the appropriation contained in this section shall be used for administration of the program. .

"Section 2. There is appropriated from the state general fund to the state board of finance, the sum of thirty-five thousand dollars ($35,000), or so much thereof as may be necessary, for use during the remainder of the forty-fifth fiscal year and during the forty-sixth fiscal year, for the administration of the 'federal-state cooperative agreement for the roughage drouth feed program.'

"Section 3. If under the agreement it becomes necessary to expend more money than appropriated in Section 1 of this act, the state board of finance may in addition issue certificates of casual indebtedness at an interest rate not to exceed two and one-half per cent up to the amount of four hundred forty-three thousand dollars ($443,000) during the forty-sixth fiscal year. This amount, or any part of it, shall be spent in the same manner and for the same purposes as set out in Section 1 of this act.

"Section 4. No part of the money appropriated under this act shall be used to pay for certificates which have been issued after January 31, 1957 provided, however, replacement certificates may be paid from this appropriation in cases when the replacement certificate is issued to correct clerical errors in the original certificate and in cases where the replacement certificate is issued to correct an error in original allowance; provided that no original allowance may be increased.

"Section 5. Emergency.—It is necessary for the peace, health and safety of the inhabitants of the state that this act become effective at the earliest time and therefore an emergency is declared to exist."

This act does not tell us who are eligible to reap the benefits of the appropriation; neither is there any standard anywhere unless it be in the contract executed by the Governor and the Secretary of Agriculture where a copy of the application is attached showing an applicant must certify that without help he will be unable to carry his foundation herd. As heretofore stated, the

issuance of the certificates was wholly a matter within the discretion of the federal officials and local committeemen appointed by them. The appropriation runs to the State Board of Finance but it is agreed the money was to be used by the state fiscal agent in paying the state's share of the certificate-draft sent to such agent.

The essence of the qualification required is the following certificate which formed a part of the application:

"I certify that the above information is correct and that my principal occupation is farming or ranching, and that I do not have a supply of feed on hand to maintain my basic herd of livestock, listed in item 1, until ——, 19——. In order to provide a supply of feed for this livestock, in addition to the feed I have on hand and to be harvested during the above period, I will need (complete either "a" or "b").

"a. —— tons of hay. b. —— pounds of surplus grains designated by the Commodity Credit Corporation.

"I hereby make application for the purchase of this amount of feed under the Emergency Feed Program. Without the assistance applied for under the Emergency Feed Program I will be unable to maintain my basic foundation herd and continue the livestock operation which I have been conducting for —— years.

"I will not sell or otherwise dispose of any of the feed herein applied for except by feeding it to my basic herd in —————— County.

"Date: ————, 19——. Applicant. ——————.''

Each applicant was limited to hay or roughage requirements for a period of 60 days.

Here it may be well to call attention to that part of the stipulation that participation was not limited to persons who were sick or indigent within the meaning of art. IX, § 14, of our Constitution set out above. The idea the persons receiving the certificates were members of such class is repelled by the relator, and he grounds his right to the writ on the disaster due to the drouth, the necessity of preserving the foundation herds which without the hay program would have gone in great numbers to a glutted market, and the further fact the livestock industry provides the basic economy of the state which it has a right and duty to preserve, even in the face of the constitutional provisions invoked by the respondents, and that the appropriation was for a public purpose.

Aid to farmers and ranchers by way of small loans for feed and seed when they were in distress has been the subject of litigation in the states of North Dakota, South Dakota, Montana, Minnesota, and Kansas, under constitutional provisions similar to our art. IX, § 14. During the

late depression a general loan program was sustained in Arkansas in 1930.

We have not found any case involving an outright gift by the state such as we have here.

The North Dakota Constitution, section 185, prohibits the making of a loan or gift except for necessary support of the poor. In the year 1890, Laws 1890, c. 152, the legislature of that state passed an act authorizing boards of county commissioners to issue bonds and make seed loans of not to exceed 150 bushels of wheat or an equivalent amount of other grain for use as seed only. Conditions were very bad due to drouths. The Supreme Court of that state in State ex rel. Goodwin v. Nelson County, 1890, 1 N.D. 88, 45 N.W. 33, 36, 8 L.R.A. 283, held the act to be constitutional.

There, an applicant was required to show the amount of grain raised the preceding year, and that he was unable to get the grain by any other means, and he was also required to repay the loan with interest. In sustaining the act the court said:

"* * * (A) class of citizens, numbered by many thousands, is in such present straits, from poverty, that unless succored by some comprehensive measure of relief they will become a public burden, in other words, paupers, dependent upon counties where they reside for support. It is to avert such a widespread disaster that the seed-

grain statute was enacted, and it should be interpreted in the light of the public danger which was the occasion of its passage."

It is further stated that under the stress of adversity peculiar to the condition of the frontier farmer there would be an expansion of the term "poor" sufficient to embrace a class of destitute citizens who had not yet become a public charge, and that such loans constituted a public purpose.

A similar seed-grain loan act, Laws 1915, c. 13, was upheld in Montana in State ex rel. Cryderman v. Wienrich, 1918, 54 Mont. 390, 170 P. 942, 945, following the reasoning of the Goodwin case. The constitution of Montana, art. 13, § 1, prohibited a loan or grant to any one, but also contained the following provision:

"The several counties of the state shall provide as may be prescribed by law for those inhabitants, who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society." Article 10, § 5.

The legislative act provided counties might issue bonds and loan the proceeds to those farmers who were unable to procure seed grain. Eligibility for a loan was severely limited as is shown by the following language taken from the opinion:

"* * * If, therefore, the phrase 'needy farmers who are unable to procure seed' may be taken to mean per-

sons engaged in agriculture who, by natural or other conditions beyond their control, are so reduced in circumstances that they have neither money, nor credit, nor property in shape to be pledged or mortgaged, and who without some aid will become paupers, dependent on the county for support—and we think this is the meaning—then the purpose to aid them is a public one, and the only subject left to consider is the validity of the means prescribed.

\*    \*    \*    \*    \*    \*

"\* \* \* (If a farmer owns property) it must be so incumbered that he cannot raise enough to buy seed and keep himself while the crop is maturing, and whatever he owns of real estate is, together with the crop, subject to a lien for the seed furnished."

We agree with the North Dakota and Montana courts their legislative acts were not proscribed by their constitutions, under the existing condition of so many of their farmers.

A constitutional provision similar to that of New Mexico was considered by the Supreme Court of Minnesota in William Deering & Co. v. Peterson, 75 Minn. 118, 77 N.W. 568, 569. There, because of drouth and other causes many farmers of the state were unable to procure seed. The legislature passed an act providing for loan of seed grain to farmers owning less than 160 acres and to those owning more than that amount if it was incumbered by a mortgage, Laws 1893, c. 225, as amended by c. 226, M.S.A. § 395. 14 note. The act was held unconstitutional on the ground it appropriated public money for private use. In commenting on the act the court said:

"\* \* \* [I]t permits every one who has not more than 160 acres of land, free from mortgage incumbrance, to borrow from the state. A person might have 10,000 acres of land, worth $100,000, subject to a mortgage of only $500, and he would be entitled, under the terms of this act, to borrow from the state. He might also have $1,000,000 worth of personal property, and still he could borrow from the state. \* \* \* Taxation cannot be imposed for a private purpose, and, if the state can appropriate for a private purpose the money in its treasury and then replace it by taxation, it can do indirectly what it cannot do directly."

There, money had been appropriated from the treasury and a tax levied to replace it.

In Cobb v. Parnell, 1931, 183 Ark. 429, 36 S.W.2d 388, a statute, Acts 1931, Act No. 10, as amended by Act No. 34, authorizing the issuance of bonds to get money for loans to farmers was held constitutional, but it is clear the act was sustained in fact as a relief measure. Crops were very poor because of a severe drouth the preceding year

and prices were low. The largest bank in the state had failed and more than 100 banks in Arkansas had closed their doors. The little money the people had was tied up in closed banks, their credit was exhausted and they were without funds with which to procure food for man or beast, and many were suffering for lack of food and not in position to labor, notwithstanding a large amount of aid which had been received from the Red Cross. Arkansas did not have a constitutional provision similar to our art. IX, § 14. Because of the pitiful condition in which the people found themselves the legislation was sustained on the theory that the loaning of the money was for a public purpose.

In South Dakota in an answer to questions submitted to the Supreme Court of that state it was held the legislature could not validly enact legislation appropriating money for feed for carrying the livestock of its citizens through the winter following a drouth. The holding was made in construing a constitutional provision that state funds could only be spent for public purpose, article 11, § 2. That state did not have a constitutional provision as did North Dakota for helping the poor. See In re Opinion of the Judges, 59 S.D. 469, 240 N.W. 600.

Relator places his principal reliance on our recent decision in Village of Deming v. Hosdreg Co., 62 N.M. 18, 303 P.2d 920, where a majority upheld legislation authorizing a municipality to issue revenue bonds in aid of private industry and take title to property purchased and used in the name of the town, Laws 1955, c. 234. There were strict prohibitions in the act against any liability on the part of the municipality, and only the revenues received were to be used for interest and retiring the principal of the bonds after the municipality had been paid its expenses for acting as trustee. By the town retaining title to the property the lessors and operators received tax advantages. It was held, however, the act was not in violation of art. IX, § 14, prohibiting a municipality from making a loan or gift to any person, association or corporation.

The basis of the majority opinion was that such advantages and aid as the lessors would receive, and who incidently were granted a very favorable option to purchase or extend the lease by a contract held to be valid, was justified as a public purpose inasmuch as it would attract industry to the state and relieve distressed communities when there were large numbers of unemployed.

Here, however, we have a different situation in that we have direct grants of state money to persons declared eligible therefor by federal agents, as above related, and such were made on the basis of need of their foundation herds of livestock without regard to numbers, or even whether the owner could provide needed hay by a slight reduction of his herd. Also, there was no re-

quirement that he maintain the herd after he had procured and fed the hay.

This court has interpreted the section of the constitution now being considered in three cases in addition to Village of Deming v. Hosdreg, which we feel are directly in point here.

Chapter 51, Laws of 1913, required the board of county commissioners in each county to appropriate annually not less than $500 from the general fund to a regularly organized and incorporated county fair, which sum was to be applied towards paying premiums on the agricultural, horticultural, arts and livestock exhibits. The constitutionality of the act was challenged and in Harrington v. Atteberry, 21 N.M. 50, 153 P. 1041, it was held to be unconstitutional. Chief Justice Roberts wrote the act must be stricken down because it was in violation of section 14 of article 9 prohibiting the giving of aid to a private corporation. Justices Hanna and Parker concurred in the result but based their decisions on the provisions of section 31 of article 4 of our constitution for the reason that while it was for an educational purpose the fair association was not under the absolute control of the state. It was agreed the money was to be used for a public purpose but that did not save the act.

Section 14 of article 9 was again before this court in Hutcheson v. Atherton, 44 N.M. 144, 99 P.2d 462. A non profit corporation had been formed to conduct expositions in 1940 commemorating the 400th anniversary of the arrival in New Mexico of Francisco Vasquez de Coronado.

By Chapter 149, Laws of 1939, counties, cities, towns, and villages were authorized to acquire sites and construct auditoriums as a meeting place for delegates and other persons attending the expositions. All counties, cities, towns and villages were authorized to issue and sell bonds for the purpose of constructing needed buildings if the proposed bond issues were approved at elections to be held in the various counties, cities, towns, or villages desiring to participate. Provision was made for the levying of taxes to pay the interest on and retire the bonds. It was also provided that the buildings should be maintained and used for other public purposes as the governing authorities might authorize.

The voters of Bernallilo county approved a bond issue of $250,000 for the purpose of constructing an auditorium in which to hold their Coronado Exposition, and a taxpayer filed suit attacking the constitutionality of the legislative act under which it was to issue and sell the bonds, as well as to levy the necessary taxes for the payment of interest and principal. This court held the act did violate section 14 of article 9, in that while it purported to provide for public buildings it was in fact a donation to a private corporation and the benefit to the county was incidental. It specifically approved the opinion of former Chief Justice Roberts in Harrington v. Atteberry.

The court recognized those engaged in promoting the exposition were serving a highly commendable public purpose, but stated that fact alone did not warrant the state or any county or city in making a donation or pledging its credit in aid of it.

State ex rel. Sena v. Trujillo, 46 N.M. 361, 129 P.2d 329, 333, 142 A.L.R. 932, held unconstitutional Chapter 110, Laws of 1941, which granted a pension to a former clerk of this court after he had left the service of the state as being in violation of section 14 of article 9, saying:

"It is not enough that we can say that a public purpose is being served when we donate to those who have performed for the state a valuable public service over a period of 30 consecutive years. The constitution makes no distinction as between 'donations', whether they be for a good cause or a questionable one. It prohibits them all * * *."

See also Zellers v. Huff, 1951, 55 N.M. 501, 236 P.2d 949.

The hay-roughage program put in effect by the federal government and aided by New Mexico was a wonderful thing for the livestock industry, and no doubt was the cause of larger numbers of livestock staying on their range in New Mexico for future production of their kind, thus benefitting the economy of the state, but if the appropriation now before us be upheld where will it stop? The zinc and lead industry is closed down in southwestern New Mexico and larger numbers of men are out of work. Also, because of low prices and demand the copper industry in the same region has greatly curtailed its production. It would be just as lawful for the legislature to grant subsidies to the producers of zinc, lead, and copper and the ones who refine the ores in order to keep the mines and smelters going and provide employment for those working in the industries as it would be to sustain the grant to the livestock producers.

The act in question attempts to give public money to private individuals in violation of article IX, section 14, of our Constitution. They are not indigents or paupers, and the money is not to be given to them to prevent their becoming such, although there is testimony that many would have had to liquidate their herds, and that because of the drouth many small ranchers and farmers left Roosevelt County. The fact that it was promised to maintain the foundation herds of livestock is not sufficient to save the appropriation, and thus give the legislature a valid basis for in effect ratifying the contract.

A careful study of all cases cited in the briefs and some found in independent research brings us to the conclusion above announced.

In view of what has been said it will not be necessary to pass upon the second point of the respondent.

The alternative writ was improvidently issued, and it will be quashed.

Since the submission of this case Edward Hartman as Finance Director has taken over the disbursement duties formerly performed by respondent Hannah, and is made a party, and will be bound by the decision and judgment of this Court.

It is so ordered.

LUJAN, C. J., SADLER and KIKER, JJ., and C. C. McCULLOH, District Judge, concur.

COMPTON, J., not participating.