ANDRES *v.* FIRST ARK. DEVELOPMENT FINANCE CORP.

5-1842                                                      324 S. W. 2d 97

Opinion delivered May 18, 1959.

*Gardner A. A. Deane, Jr.,* for appellant.

*Bruce Bennett, Atty. General, Rose, Meek, House, Barron & Nash,* for appellee.

*James P. Baker, Jr., Amicus Curiae* brief.

*Dickson & Putman, Minor Millwee* and *E. J. Ball, Amici Curiae* brief.

ED. F. McFADDIN, Associate Justice. This is a suit brought by appellant as a citizen, resident and taxpayer, seeking, *inter alia,* a declaratory judgment regarding the validity of Act No. 567 of 1957, which is captioned: ''An Act To Provide For Development Finance Corporations; To Define Their Functions, Powers, and Duties; And For Other Purposes''. The Trial Court held against the appellant on all points, and this appeal ensued. The defendants below (and appellees here) are: First Arkansas Development Finance Corporation (hereinafter referred to as ''Finance Corporation''), the State Board of Finance (hereinafter referred to as ''Board''), and individuals composing the Board. (See Act No. 338 of 1955 and § 13-401 *et seq.* Ark. Stats.)

The complaint alleged, *inter alia:*

(a) That Finance Corporation purports to be organized and existing under provisions of Act No. 567.

(b) That, pursuant to Act No. 567, Finance Corporation proposes to lend to the Scott County Industrial Development Corporation (organized and functioning under Act No. 404 of 1955) the sum of $130,000.00 to enable the Scott County Industrial Development Corporation[1] to assist the Scott County Milling Company (a private Arkansas corporation) to establish and operate a feed mill and broiler hatchery.

(c) That to provide funds to make said loan of $130,000.00 to the Scott County Industrial Development Corporation, the defendant Finance Corporation

---

[1] We call attention to the fact that Act No. 404 of 1955 was for *"Industrial Development";* and Act No. 567, now under consideration, is to provide *finances for industrial development.*

proposed to issue and sell to the public and to the State Board of Finance, $130,000.00 of Finance Corporation's bonds, as authorized by the Act No. 567.

(d) That unless restrained, the State Board of Finance ". . . will be called upon under the provisions of the said Act No. 567 to purchase, pay for, and take delivery of a portion of the said bonds of . . ." Finance Corporation; and, unless restrained, will act to the great and irreparable injury of the plaintiff and others similarly situated.

(e) That the Act No. 567 is unconstitutional in whole; and if not unconstitutional in whole is unconstitutional by reason of § 19 of said Act.

(f) That Finance Corporation is not validly and legally organized and functioning.

The prayer was, *inter alia,* that a decree be entered holding Finance Corporation to have been illegally organized, and that Act No. 567 be held void *in toto,* or at least as to § 19.

### The Act No. 567

Before discussing the assignments listed on appeal, we give a brief synopsis of some of the pertinent portions of the Act No. 567. Fifteen or more duly qualified citizens may organize a "development finance corporation" by filing with the State Bank Commissioner certain articles. The State Bank Commissioner, upon making inquiry and being satisfied with the standing, ability, and residence of the incorporators, may issue his certificate of preliminary approval. The incorporators may then proceed to obtain additional stockholders and the payment of stock, may elect directors, adopt by-laws and other regulations, and then submit a further report to the State Banking Board. The State Banking Board will make further investigation to ascertain whether public convenience and necessity require the finance corporation, whether the stockholders possess the requisite qualifications, whether at least $100,000.00 of common stock, and at least $900,000.00 of preferred stock have

both been fully paid for, and whether the by-laws and regulations are in keeping with all laws of this State. If the State Banking Board is satisfied of all of the foregoing, then the State Bank Commissioner will issue a certificate of incorporation; and there must be included in the name the words, "Arkansas Development Finance Corporation".

There may be any number of such finance corporations so organized. Section 13 of the Act No. 567 says in part: "The purposes of each development finance corporation organized under the provisions of this Act shall be to promote, stimulate, develop, and advance the business prosperity and economic welfare of the State of Arkansas and its citizens; to encourage and assist through loans, investments, or other business transactions, in the location of new business and industry in this State . . . and to provide financing for the promotion, development, and conduct of all kinds of business activities in this State."

The Act further provides that the corporation shall act without profit to any of its members, shall never receive deposits from the public, but may issue bonds and debentures, and that all such obligations shall be on a parity as to security and shall be secured by a lien on the entire assets of the corporation. The Act also provides in § 19 that the State Board of Finance may purchase and hold, in its securities account, bonds of any development finance corporation as the State Board of Finance may see fit. Section 22 of the Act makes the bonds of any finance corporation eligible for investment by certain Funds. Each finance corporation organized under the provisions of this Act shall be subject to the supervision, examination, and control of the State Bank Commissioner jointly with the State Board of Finance. So much for a brief synopsis of the Act:[2] now we come to a discussion of the assignments made by the appellant.

---

[2] In the excellent briefs submitted by the *amici curiae*, there have been listed the statutes and decisions from various States involving legislation along the same general lines as our Act No. 404 of 1955 or the Act No. 567 here under consideration. For statutes—most of which have not experienced court testing—see:

. I. The appellant says: *"Said Act No. 567, in that it authorizes the issuance of bonds for the purpose of industrial and agricultural development, is in violation of the provisions of Article 16, Section 1, of the Constitution of the State of Arkansas, as amended by Amendment 13 to the Constitution of the State of Arkansas, and is in violation of the provisions of Amendment No. 17 to the Constitution of the State of Arkansas, as amended by Amendment No. 25 to the Constitution of the State of Arkansas.* Throughout the appellant's brief there is the refrain that the Act No. 567 is entirely unconstitutional because it is in reality, but through subterfuge, a lending of the credit of the State; and in this assignment now under discussion the appellant points to the specific con-

Florida: Sections 289.01 *et seq.* of 1957 Statutes
Hawaii: Act No. 288 of 1957
Kansas: Chapter 144, Session Laws of 1955
Massachusetts: Chapter 671 of the Acts of 1953
Michigan: Act No. 158 of 1956
Minnesota: Chapter 896, Session Laws of 1957
New Hampshire: Chapter 254 of 1955
New York: Chapter 863 of 1955
Pennsylvania: Title 73, § 301 *et seq.* of Purden's Statutes.
Rhode Island: Chapter 3045 of 1953
South Dakota: Chapter 314, Session Laws of 1957
Vermont: Act No. 151 of 1953
Wisconsin: Chapter 225 of Statutes of 1957
A reading of the various statutes indicates that none is exactly similar to Act No. 567; but the statutes show that various States have been trying to encourage industrial development, either at the State, municipal, or voluntary corporation level. Up to the present, most of the litigation on the constitutionality of aid to industrial development seems to have involved legislation which allowed counties or municipalities to grant aid, and in some of those cases the question was whether such industrial development was a "public purpose". Some of the cases are: *McConnell* v. *City of Lebanon* (Tenn.), 314 S. W. (2d) 12; *Albritton* v. *City of Winona*, 181 Miss. 75, 178 So. 799; *Dyche* v. *City of London* (Ky.), 288 S. W. (2d) 648; and *Miller* v. *Police Jury*, 226 La. 8, 74 So. (2d) 394. Some of the other cases which we have studied are: *Faulconer* v. *City of Danville*, 313 Ky. 468, 232 S. W. (2d) 80; *Opinion of the Justices*, 254 Ala. 506, 49 So. (2d) 175; *Newberry* v. *City of Andalusia*, 257 Ala. 629, 57 So. (2d) 629; *Holly* v. *City of Elizabethton*, 193 Tenn. 46, 241 S. W. (2d) 1001; *Village of Deming* v. *Hosdreg*, 62 N. M. 18, 303 Pac. (2d) 920; *Wilmington* v. *Ranken* (Del.), 105 A. (2d) 614; and *Frostburg* v. *Jenkins*, 215 Md. 9, 136 A. (2d) 852; *State* v. *North Miami* (Fla.) 59 So. (2d) 779; *State* v. *York*, 164 Neb. 223, 82 N. W. (2d) 269; *Opinion of the Justices*, 99 N. H. 528. See also article, "Municipal Inducements to Private Industry", Minn. Law Review, May 1956, Vol. 40 p. 681 *et seq.* and review of the article in Law Review Digest, Vol. 6, p. 83 *et seq.*

stitutional provisions, as mentioned. The germane portions of Article 16 of the Constitution and Amendment No. 13 thereto, as urged by the appellant, are contained in this identical language:

"Neither the State, nor any city, county, town or other municipality in this State, shall ever lend its credit for any purpose whatsoever . . ."

From the synopsis of the Act No. 567, as heretofore given, it is evident that the Act authorizes the organization of finance corporations under the control of the State Banking Department; and that such corporations may determine what loans and investments to make to assist in the industrial development of Arkansas. We have laws regarding State banks (§ 67-301 *et seq.* Ark. Stats.), which authorize State banks to make loans; but, by no stretch of the imagination can it be said that the State is "lending its credit" merely because a State bank makes a loan. We have laws regarding business corporations (§ 64-101 *et seq.* Ark. Stats.), which authorize business corporations to incur indebtedness; but no one could seriously urge that, because the State authorizes corporations to incur indebtedness, the State is itself liable for such debts. The Act No. 567, in allowing the organization of *finance corporations,* is of like effect in this regard as the State Banking Act and the Business Corporations Act. The State is not "lending its credit" merely because it authorizes the organization of a corporation which may finance industrial development corporations organized under Act No. 404 of 1955. Our holding in *Halbert* v. *Helena,* 226 Ark. 620, 29 S. W. 2d 802, is in point. We see no merit to the contention that the Act No. 567 violates Article 16 of the Constitution or Amendment No. 13 of the Constitution.

The appellant urges that the Act No. 567 violates Amendments 17 and 25 to the Constitution. The portion of these Amendments relied on by the appellant limits counties in issuing bonds; and the appellant says that these *finance corporations* created under the Act No. 567 occupy about the same status as the counties referred to

in Amendments Nos. 17 and 25. Appellant points to our case of *Williams* v. *Harris*, 215 Ark. 928, 224 S. W. 2d 9, wherein we held that a municipal corporation could not issue bonds with the proceeds to be used for the construction of a factory building for a private corporation; and appellant says:

"Since the public, in the form of the municipality and the county, may not aid private enterprise, the question becomes whether a private non profit corporation purporting to act for the public may do so. Act No. 567 requires that in the organization of First Arkansas each Congressional District in the State be represented by stockholders and by a director, and it must be chartered through the State Banking Department after a finding that convenience and necessity require the existence of the corporation.

"This gives the private corporation some of the characteristics of a representative of the public acting for a public purpose. Appellant takes the position that financing a private business enterprise is not a public purpose, that a municipality or county may not support a private business enterprise, and that a private non profit corporation representing the public may not do so for them."

This contention is easily answered. In *Halbert* v. *Helena, etc. Industrial Development Corporation*, 226 Ark. 620, 291 S. W. 2d 802, we had before us Act No. 404 of 1955, and we held that a corporation organized under that Act was a private corporation and that the Cities of Helena and West Helena were in no sense liable for the obligations of the Industrial Development Corporation. That case points to the holding here. The finance corporations authorized by the Act No. 567 are, as we have heretofore said, corporations set up to provide *finances* that may be loaned to development corporations organized under the Act No. 404 of 1955. The finance corporations are non-profit corporations, but their actions do not make liable the State or any of its subdivisions for the obligations of such corporations.

In the case at bar, the Scott County Industrial Development Corporation, organized under the Act No. 404 of 1955, is desirous of lending money to the Scott County Milling Company, a business corporation — just as the Helena-West Helena Industrial Development Corporation was interested in lending money to the Mohawk Rubber Company in the reported case of *Halbert* v. *Helena (supra)*. In order to provide a pool or repository from which the Scott County Industrial Development Corporation, and other Industrial Development Corporations, may obtain funds to loan to business corporations — like Scott County Milling Company in the case at bar, and Mohawk Rubber Company in the reported case — the Legislature, by Act No. 567, authorized the incorporation of finance corporations — like appellee here — which, after first obtaining one million dollars of capital stock from public spirited citizens, will then be able to issue notes and bonds; and from the sale thereof are permitted to make loans to various local industrial development corporations which may qualify with worthy and worthwhile projects. The fact, that public spirited citizens of Arkansas have placed one million dollars of their personal funds into this Finance Corporation, certainly provides tangible evidence that this Finance Corporation is not a "fly-by-night" concern. It has a financial base which makes its notes and bonds supported by something "tangible". We can see no merit to appellant's assignment here under consideration.

II.  The appellant says: *"Section 19 of said Act No. 567 is in violation of the provisions of Article 16, Section 1, of the Constitution of the State of Arkansas, and is in violation of the provisions of Amendment No. 13 to the Constitution of the State of Arkansas"*; and *"The defendants, Orval E. Faubus, J. Vance Clayton, Jimmie Jones, Kelly Cornett,*[3] *and Dick Simpson, Members of the State Board of Finance, may not legally purchase the bonds of the defendant, First Arkansas De-*

---

[3] Kelly Cornett was State Comptroller when this suit was filed and when appellant's brief was prepared on appeal; but Kelly Cornett departed this life, and Julian Hogan has been substituted as the Acting State Comptroller.

*velopment Finance Corporation."* This point in appellant's argument brings us to the consideration of the point which caused the Court to ask for *amici curiae* briefs.[4] The germane language of Art. 16 of the Constitution and Amendment No. 13 has heretofore been quoted: "Neither the State, nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatsoever . . ." Section 19 of the Act No. 567 reads in part: "PURCHASE OF BONDS BY THE STATE. In addition to the securities of the character which it is now authorized to purchase and hold in the Securities Account, the State Board of Finance *may, in it discretion,* purchase, at a price not to exceed par and accrued interest, bonds of any development finance corporation organized under the provisions of this Act to the extent of Five Million Dollars ($5,000,000.00); . . ." (Emphasis supplied.)

The appellant most forcibly urges that under this Section the State Board of Finance is given "carte blanche" to invest State funds in the bonds and notes issued by the Finance Corporation; and that what the State may not do directly within the inhibition of the Constitution, it certainly should not be allowed to do indirectly by "raiding" the State Treasury to provide funds for industrial development. Our attention has been called to the history of some of the States in the era of Railway Construction. The States either issued their obligations to allow the building of railroads, canals, and other projects or purchased the corporate stock of such concerns: and the effects were almost to bankrupt such States. Appellant says that it was in the light of such experience that the framers of the Constitution of 1874 used the language in the opening sentence of Sec. 1 of Art. 16, as herein involved. Our attention is called to the following classical language, contained in an annotation in 152 A. L. R. 495:

---

[4] In a *per curiam* order of even date we have expressed appreciation to the named members of the Bar, who at our invitation filed *amici curiae* briefs, all of which have proved most helpful.

" 'Early in the nineteenth century it seems to have been the general practice of states to encourage the building of railroads by permitting the state or a subdivision thereof to purchase stock in railroad corporations, to issue bonds, or lend credit in aid of railroads, or to make outright donations to them. However, due to the large number of insolvencies of railroads, caused by frauds or economic conditions, states and subdivisions thereof found themselves largely indebted, and were themselves occasionally insolvent because of large investments in such enterprises. Therefore a reversal of policy set in. As early as 1851 Ohio adopted a constitution containing a provision prohibiting stock subscriptions or other forms of aid to corporations. In the ensuing twenty-five years most of the other states adopted similar provisions, either prohibiting aid altogether or requiring a vote of the people before a subscription to stock or other sort of aid could be made or extended. At present, at least thirty-eight states have such constitutional provisions, and several have statutory provisions on the subject.' "

Furthermore, our attention is directed to the case of *Cobb* v. *Parnell*, 183 Ark. 429, 36 S. W. 2d 388, which authorized a commission to issue bonds in the sum of $1,500,000.00 pledging the full faith and credit of the State to finance farmers and stock raisers, and it is pointed out to us that in the reported case there was language which indicated that it was a borderline emergency drouth relief proposition, or otherwise the legislation could not have been sustained. We have carefully studied these matters; and also, we have studied the financial report of the Comptroller for the past several fiscal years[5] to ascertain the amount in the Securities Account and the type of securities purchased by the State Finance Board.

After weighing all the factors in the matter, we reach the conclusion that the appellant's objections, to § 19 of the Act, are not well taken. Section 19 does not *re-*

---

[5] This report is a public document, as provided by § 12-1907 Ark. Stats.

*quire* the State Board of Finance to purchase any bonds or notes of any finance corporation: it merely authorizes the Board, in its discretion, to purchase notes and bonds of a finance corporation organized under Act No. 567 if the Board decides that the securities are worthwhile. The Act says that the bonds and notes issued by a finance corporation (which has a foundation of one million dollars in cash) may be considered as securities[6] in which the Board *may* invest a portion of the State's Surplus Security Fund. In *Halbert* v. *Helena* (*supra*), we said:

"Whether the State Board of Finance invests the State's surplus in one kind of bond or another is a matter for the Legislature to permit, and for the State Board of Finance to then decide in the exercise of its discretion. Certainly the Legislature can determine what kind of securities can be purchased by the State Board of Finance in its discretion,[7] and until it is shown — and it has not been so shown here — that the State Board of Finance has abused its discretion or that such investment impairs the State's ability to pay outstanding obligations as they mature, then no case is made by the appellants under this point."

We reach the conclusion that the appellant cannot prevail on the assignment listed in this topic.

III. The appellant says: "*Defendant, First Arkansas Development Finance Corporation, is not validly organized under the provisions of Act No. 567 of the Acts of the General Assembly of the State of Arkansas of 1957*"; and "*The defendant, First Arkansas Development Finance Corporation, is without authority to issue and sell bonds under said Act No. 567*". A considera-

---

[6] According to the Comptroller's report of June 30, 1958, the Securities Account had slightly in excess of eighteen million dollars of securities already; so unless the finances of the State of Arkansas take a tremendous upturn, we can see no possibility of the State Board of Finance investing the maximum of seven and one-half million dollars in these Finance Corporation bonds.

[7] For a case from another jurisdiction reaching a like conclusion in regard to discretion in investment of State Funds, see *Fairbanks* v. *Stratton* (Illinois), 152 N.E. (2d) 569.

ble portion of the record in this case concerns these assignments, which we consider academic, as far as the appellant is concerned, since we have reached the conclusion that the Act No. 567 is valid. In answer to these allegations, the Finance Corporation has attached a list of all of its stockholders, subscribers, and directors; has filed the Certificate of the Bank Commissioner of the State of Arkansas granting the preliminary approval on July 8, 1957; the findings of the State Banking Board on August 6, 1958; and the Certificate of Incorporation issued by the State Bank Commissioner on August 6, 1958. The Finance Corporation is desirous of showing that every requirement had been carefully fulfilled in its organization, which probably is true. Our attention has not been directed to any alleged irregularity in the corporate organization. But, even so, after considerable study, we have reached the conclusion that the appellant is not in any position to raise the questions in this assignment.

The appellant has not alleged that he is a stockholder in the Finance Corporation, or has ever had any business dealings with the corporation, or that the corporation has ever made any claims of any kind against him. So we see no reason why he is entitled to a declaratory judgment as to the legality of the existence of the Finance Corporation. As a citizen, resident, and taxpayer, he could question the constitutionality of the Act; but as a citizen, resident, and taxpayer he has no right to question the corporate existence of the Finance Corporation through declaratory judgment proceedings. The usual rule is that the State may proceed by *quo warranto* to test corporate existence; but, in the case at bar, the Attorney General says that Finance Corporation is validly organized. In 13 Am. Jur. 206, "Corporations" § 61, the rule is stated:

"If the state, which alone can grant the authority to incorporate, remains silent during an open and notorious assertion and exercise of corporate powers, an individual will not, unless there is some powerful equity on his side, be permitted to raise the inquiry. The individual

cannot create the corporation or grant, define, or limit its powers, and no grant of these by the sovereign can lessen his rights. There can consequently be no cause of complaint by the citizen, and no right to inquire whether corporate existence is rightful *de jure,* or merely colorable. It would produce endless confusion and hardship, and probably destroy the corporation, if the legality of its existence could be drawn in question in every suit to which it was a party, for then no judgment could be rendered which would finally settle the question.''

Our declaratory judgment act (§ 34-2501 *et seq.* Ark. Stats.) was not intended to allow *any* question to be presented by *any* person: the matters must be justiciable. In Anderson on ''Declaratory Judgments'' 2nd Ed. § 187, the general rule is stated as to declaratory judgments:

''Since purpose of the declaratory relief is to liquidate uncertainties and interpretations which might result in future litigation it may be maintained when these purposes may be subserved. The requisite precedent facts or conditions, which the courts generally hold must exist in order that declaratory relief may be obtained, may be summarized as follows: (1) There must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy; in other words, a legally protectable interest; and (4) the issue involved in the controversy must be ripe for judicial determination.''

In the same authority in § 221 at page 488 the rule is stated:

''The Declaratory Judgment Statute is applicable only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented. It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A declaratory judg-

ment will not be granted unless the danger or dilemma of the plaintiff is present, not contingent on the happening of hypothetical future events; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote.''

In the light of all of the foregoing, we conclude that the appellant has shown no reason for asking any court to decide the corporate status of the appellee. When we hold the Act valid — as we do — the appellant has obtained all the answers he is entitled to receive in this declaratory judgment proceeding. Accordingly, we modify the decree by cancelling the attack on the corporate existence of Finance Corporation, and we affirm the decree in holding Act No. 567 of 1957 to be valid.

GEORGE ROSE SMITH, J., not participating.

WARD, J., concurring.

ROBINSON and JOHNSON, JJ., dissenting.

PAUL WARD, Associate Justice, concurring.

I concur in the result reached by the majority but I do not agree with a vital portion of the reasoning by which that result is achieved.

First, however, let me state briefly my reasons for upholding Act No. 567 of 1957. I base it entirely on the language and reason given by this Court in the case of *Halbert* v. *Helena,* 226 Ark. 620, 291 S. W. 2d 802, where we said:

"Section 34 of Act 404 authorizes the State Board of Finance 'in its discretion' to purchase from local development corporations fifty per cent of the principal amount of the bond issue up to a certain amount. The State is certainly not lending its credit to the local development corporation when it purchases bonds and receives the bonds . . . Whether the State Board of Finance invests the State's surplus in one kind of bond or another is a matter for the Legislature to permit, and for the State Board

of Finance to then decide in the exercise of its discretion. Certainly the Legislature can determine what kind of securities can be purchased by the State Board of Finance in its discretion . . ."

So it is plain that Act 567 purports here to authorize exactly what we approved in the cited case.

I am fearful, however, of certain language and reasoning found in the majority opinion. The majority opinion states that Act 567 "does not *require*" but "merely *authorized*" the State Board of Finance to purchase bonds. Thus the majority seem to say that no matter how unconstitutional any activity is, it becomes constitutional if the Legislature merely authorizes it to be done and does not require it to be done. A few illustrations will demonstrate the danger and fallacy of this reasoning. Our Constitution, Art. 2, Sec. 3 guarantees a trial by jury; Art. 2, Sec. 16 prohibits imprisonment for debt; Art. 2, Sec. 26 prohibits a religious test for voting; Art. 5, Sec. 20 says the State shall not be made a party defendant; Art. 14, Sec. 2 prohibits school money from being used for any other purpose, yet who would dare defend the constitutionality of an Act of the Legislature which permitted the violation of those guarantees? One of the best recognized rules of jurisprudence is to the effect that an Act must be judged by what it permits to be done.

The majority is confusing a constitutional question with a question of propriety. To illustrate: The State has constitutional authority to place its surplus funds in a bank for safe keeping until they are needed for operational purposes but an Act *requiring* it to keep them there would be void. In other words an act of the Legislature could not disrupt the governmental processes. So, what makes Act 567 constitutional is not the single word *authorize* but it is the character of the entire transaction which we approved in the *Helena* case.

JIM JOHNSON, Associate Justice, dissenting.

It is regrettable when one member of the Court is unable to concur with the majority upon such an important and far reaching question as is here involved. My love for Arkansas and for future financial stability will not allow me to do otherwise. I am convinced that the majority opinion will open wider the flood gates for the enactment of future legislation based upon the Court's stamp of approval given Act 567 of 1957, this Act being the result of the stamp of approval given a similar act which was 404 of 1955, the same being sanctioned by this Court on June 25, 1956, in the case of *Halbert* v. *Helena-West Helena Industrial Development Corporation,* 226 Ark. 620, 291 S. W. 2d 802. Unless every possible precaution is taken to resist the temptation of further expansion of the trend to deplete the State Treasury, set by the approval of these two Acts, there can be but one of two alternatives — higher taxes or bankruptcy of the State, neither of which will be attractive to new industry. Such an eventuality, of course, would defeat the original laudable intent of these very acts which was to attract industry to Arkansas in the first place. To verify the fact that states can find themselves in such a predicament, one needs only to look to the States of Michigan, Massachusetts, Minnesota, and Ohio, to name a few who are, even in these times of abundance, faced with such a catastrophe. In fact, there are still a number of people on the State payrolls who recall the earily thirties here in Arkansas when it was necessary for them to discount their meager checks or warrants in order to feed their families.

Most of us are aware of the crying necessity of attracting industry to Arkansas. The fact that we are blessed with an abundant water supply, an abundant electrical and fuel supply at reasonable rates, the best climate in the country, and an abundant supply of the most competent and willing laborers in America should be enough, with the dedicated efforts of the Chambers

of Commerce and other similar organizations, to attract industry. This combination standing alone is responsible for the location of the vast majority of the financially stable industries in Arkansas today. As a general rule, industry that requires subsidizing is not the most desirable citizen to be found. The Act here under consideration and its predecessor were, no doubt, a result of the legislature's desire to speed up the industrialization process, but even the legislature must have recognized the shaky constitutional grounds these acts were on when in the same session Act 567 was passed, the 1957 General Assembly by House Joint Resolution No. 23 submitted to the people for their consideration a proposed constitutional amendment, the first section of which reads as follows:

"Any city of the first or second class, any incorporated town, and any county, may issue, by and with the consent of the majority of the qualified electors of said municipality or county voting on the question at an election held for the purpose, bonds in sums approved by such majority at such election for the purpose of securing and developing industry within or near the said municipality holding the election, or within the county holding the election."

The people, recognizing that this Amendment would give them a voice in obtaining the industry they desired to finance and place the financing of the same on a solid foundation without possible impairment to the financial stability of the State, adopted Amendment No. 49 by a substantial majority, the vote being 166, 303 for and 87,793 against.

There can be little argument but that this amendment more than adequately meets the need for this type of legislation in Arkansas, and completely removes the validity of any contention that Act 404 of 1955 and Act 567 of 1957 were of such a public purpose that they would justify repealing by court decision the constitutional pro-

hibition against lending the State's credit for any purpose.

Reviewing the record and briefs in this case, I believe that even the majority will agree with me when I say that this has been, to say the least, a friendly lawsuit. The appellees wanted to win and the appellant apparently didn't mind losing. As a result of this friendly situation the Court requested submission of Amicus Curiae briefs. We received only two responses to this request and as fate would have it both of these responses were in favor of appellee. Consequently the views expressed here are substantially my own and not particularly those of appellant.

The majority opinion says that "The finance corporations are non-profit corporations, but their actions do not make liable the State or any of its subdivisions for the obligations of such corporations." Section 24 (1) of the Act is as follows:

"A development finance corporation organized under the provisions of this Act shall not lend money when credit is readily available elsewhere. Before granting a loan, the directors of the corporation shall endeavor so far as is reasonably possible to ascertain that the first opportunity to grant the loan has been given to the banks, the insurance companies, and to the other lending institutions of the State."

This section clearly provides that loans will be made only to those persons, firms or corporations who cannot obtain financing elsewhere. After they are found unworthy by established lending institutions they then become prime prospects to receive State money through these corporations which were created for the sole purpose of lending the State's credit. If established institutions won't lend these prospects money, how can we be assured that they will repay the money they receive from the taxpayers of Arkansas through these corporations. Therefore, the question ceases to be whether or not the State

will be liable for the obligations of the corporations but instead becomes a question of whether or not we can get our money back. The majority answers these questions as follows:

> "The fact, that public spirited citizens of Arkansas have placed one million dollars of their personal funds into this Finance Corporation, certainly provides tangible evidence that this Finance Corporation is not a 'fly-by-night' concern. It has a financial base which makes its notes and bonds supported by something 'tangible'."

Now let's examine the Act and see just how "tangible" the million dollar financial base really is—$100,000 of this million was put up by the purchase of capital stock; $900,000 of this money was put up by the purchase of preferred stock. Section 15 of the Act is as follows:

> "The outstanding preferred stock of a corporation authorized and issued as provided in this Act shall be retired from time to time from the proceeds received by the corporation from the issuance and disposal of its debentures, as provided in this Act, and until all of the issued and outstanding preferred stock of the corporation shall have been retired, all proceeds of the corporation received from the issuance and disposal of its debentures must be used for the retirement of the outstanding preferred stock of the corporation. Such preferred stock shall be retired by lot, and the procedure for determining the preferred stock so to be retired and for its retirement may be provided in the by-laws of the corporation. Preferred stock of the corporation retired as herein provided shall be cancelled and shall not be re-issued."

This section of the Act provides that the preferred stockholders shall receive their $900,000 back first. When this has been accomplished, the only base left will

be the money from the sale of capital stock which is far from a million dollars.

The gravamen of this lawsuit is whether or not Act 567 and particularly Section 19 thereof violates the provisions of Article 16, Section 1, and Amendment 13 of the Arkansas Constitution. The constitutional provision in question provides: "Neither the state nor any city, county, town or other municipality in this state shall ever lend its credit for any purpose whatever." (This section of the Constitution was amended by Amendment No. 49 removing cities, counties, towns and municipalities from the prohibition contained therein thereby leaving it applicable only to the state.)

Section 19 of Act 567 is as follows:

"In addition to the securities of the character which it is now authorized to purchase and hold in the Securities Account, the State Board of Finance may, in its discretion, purchase, at a price not to exceed par and accrued interest, bonds of any development finance corporation organized under the provisions of this Act to the extent of Five Million Dollars ($5,000,000); provided, however, that after any development finance corporation organized under the provisions of this Act has issued and has outstanding its bonds in the principal amount of Five Million Dollars ($5,000,000), including any bonds purchased by the State Board of Finance as herein authorized, the State Board of Finance may, in its discretion, purchase, at a price not to exceed par and accrued interest, additional bonds of such development finance corporation issued in excess of the first Five Million Dollars ($5,000,000) of such bonds, but not to exceed fifty per cent (50%) of the principal amount of any such additional bonds issued by the development finance corporation within its limitations, as authorized in this Act. In its purchase of bonds in excess of Five Million Dollars ($5,000,000), if it shall elect to purchase any of the bonds of a de-

velopment finance corporation, the State Board of Finance shall make such additional purchases only concurrently with other purchasers and only to the extent of their purchases. The State Board of Finance may not purchase any bonds of a development finance corporation in the secondary market.

"Interest received on all such bonds purchased by the State Board of Finance and held in the Securities Account shall be special revenues and shall be credited to the Securities Reserve Fund. Proceeds of the sale of any such bonds by the State Board of Finance shall be available for re-investment in additional bonds of the character herein authorized.

"Prior to the purchase of any bonds of a development finance corporation organized under the provisions of this Act, there shall be furnished to the State Board of Finance, without cost to it, the opinion of legal counsel acceptable to the Board, approving the validity of the issue and reciting that in the opinion of counsel the bonds to be purchased by the State Board of Finance are the direct general obligations of the corporation, secured by a first and valid lien on the entire assets of the corporation."

The majority opinion places great weight on the fact that the Act provides that the State Board of Finance *may, in its discretion,* spend seven and one-half million dollars of the State's money and in the same breath, in effect, concedes that if the Act had *required* the investment of money from the State's Security Account in these bonds, then the conclusion would be inescapable that the Act was a lending of the State's credit. As hard as I may try I am unable to see the logic of this reasoning. Whatever discretion the State Board of Finance has was delegated from the Legislature. The question therefore is, does the Legislature have the power to lend the State's credit? If not, how could they delegate that power they do not possess? Does the difference in the words *require* and *may* cause the act of purchasing at all any less a lend-

ing of the State's credit? The act of lending is the test, whether it be mandatory or permissive. Would the majority say that there is a difference in lending one dollar of the State's money as opposed to lending seven and one-half million dollars, I am convinced that the majority would concede without hesitation that the State Board of Finance could not lend money from the State Treasury directly to Scott County Milling Company, a private corporation, yet they are saying in the majority opinion that it is alright to lend them the same money if it passes through the hands of two straw corporations before it gets to them. Certainly I say that the result of such logic, whether the words *may* or *require* are considered, permits the State to do by indirection the very thing it could not directly do, a theory which has been consistently condemned by this Court.

In contending that the purchase of bonds of the First Arkansas Development Finance Corporation by the State Board of Finance, as authorized by Section 19 of Act 567 of 1957, amounts to a lending of the State's credit and is prohibited by Art. 16, Sec. 1 of the Constitution of Arkansas, I attempt to give consideration to every aspect of the case.

A "Bond", as applied to finances and the sense in which here employed, is defined by Webster's Dictionary (2 Ed.) as "A bond made by a government or corporation as an evidence of debt, usually for the purpose of borrowing money; also, any one of a series of instruments evidencing an integral part of such a debt, as a $1,000 Liberty *bond* . . ."

Since a bond is nothing more than a loan of money upon a promise to pay, the question may be asked; "Is not every purchase of a bond by a state a loan of the state's credit?" The answer is no, so long as the underlying and activating purpose of the transaction and the financial obligation incurred are for the state's benefit. In *Almond* v. *Day,* 197 Va. 782, 91 S. E. 2d 660, where a lending of credit was under consideration it was said:

"Use of the State's funds for purchase of securities for the State's benefit is not an extension of 'credit' which poses any threat to the financial security or welfare of the State. Extending its credit to aid and promote private enterprise was the evil from which the State had suffered financially. The potential danger incurred in lending credit to foster and promote the interests of those who had no rightful claim, in justice or in morals, to the State's help or relief was the evil to be arrested. When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. Merely because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the 'credit clause' prohibition.''

What then is the purpose for the purchase of the bonds in question? Section 13 of the Act (567 of 1957) provides: "The purposes of each development finance corporation organized under the provisions of this Act shall be to promote, stimulate, develop and advance the business prosperity and economic welfare of the State of Arkansas and its citizens; to encourage and assist through loans, investments, or other business transactions, in the location of new business and industry in this State, and to rehabilitate and assist existing business and industry . . . and to provide financing for the promotion, development and conduct of all kinds of business activity in this State . . .''

In Section 29, the emergency clause, it is said:

"It has been found and it is hereby declared by the General Assembly of the State of Arkansas that the State of Arkansas has had heretofore an inadequate program for financing the agricultural, industrial and economic development of the State and of

its several sections, that on account of such inadequate program, the State of Arkansas has been unable to provide for its inhabitants sufficient opportunities in agriculture and industry, that on account thereof the State of Arkansas is threatened with a decreasing standard of living for its inhabitants,. that unless an adequate program for financing the agricultural, industrial and economic development of the State be immediately undertaken, the State of Arkansas will suffer immediate and irreparable loss in population and the opportunity for agricultural and industrial expansion . . ."

In determining whether the purpose of the purchase of the bonds in question—*i.e.* "to provide financing for the promotion, development and conduct of all kinds of business activity in this State"—contravenes the prohibition against the lending of the State's credit, I look to the reasons for the placing of such a constitutional limitation.

In *Cobb* v. *Parnell,* 183 Ark. 429, 36 S. W. 2d 388, this Court in pointing out the evils to be avoided by the restriction said:

"The State had just been liberated from the domination of alien adventurers who, under the guise of fostering the industries of the State by lending to them credit, had looted the treasury. A notable example of unwarranted and improvident loans of the State's credit was the aid given to the building railroads. That it was only to prevent a recurrence of this that Sec. 1, Article 16, was adopted was apparent from the fact that at the first session of the Legislature after the adoption of the Constitution of which Article 16 is a part, the Legislature passed an act providing for the issuance of bonds . . ."

In *Almond* v. *Day, supra,* the Supreme Court of Virginia in pointing out the evils which brought about a similar restriction said:

"Prior to adoption of Sections 12, 14 and 15 in the Constitution of 1869, the State of Virginia had freely extended its credit and aid to corporations engaged in works of internal improvement. In 1816, the General Assembly created 'The fund for Internal Improvement,' and incorporated a 'Board of Public Works' to administer the fund. Acts 1816, ch. 17, p. 35. Subsequent acts of the General Assembly show that through this Board large sums of money were loaned or advanced by Virginia to various corporations engaged in developing and operating privately owned works of internal improvements, such as canal, turnpike and railroad companies, that held promise of public benefit. Financial obligations in vast sums were incurred by the State, and its credit was freely but often unwisely extended to foster these enterprises by purchase of their bonds and stock, or through guarantee of their obligations and indebtedness. This was done with the hope and expectation that the enterprises would thrive and bring to the areas served business prosperity and to the State at large public benefit.

"The magnitude of the obligations incurred by the State, and the amount of money lost by lending its credit and financial aid to such enterprises may be ascertained from an historic report of J. D. Imboden, entitled 'Early History of Transportation in Virginia' in Vol. 17, page 5. House Executive Documents, 2nd Session 49th Congress, 1886-87. At page 75 of this report it is stated that the State's railroad losses, which included its losses incident to the James River and Kanawha Canal, amounted to over $26,000,000. See also Pearson: The Readjuster Movement in Virginia, Chapter I; McDaniel: The Virginia Constitutional Convention of 1901-1902, at page 59; and Virginia Magazine of History and Biography, Vol. 59 (1951), page 423, *et seq.*

"This condition was not peculiar to Virginia. Decisions from other states, construing similar restrictive provisions in their constitutions, show that those states had extended aid to enterprises of like nature and that financial obligations and losses thus incurred to foster and promote works of internal improvement brought about the adoption of their restrictive constitutional provisions. Descriptive of the practices engaged in by the states and informative of the unfortunate results experienced by many is the following statement in 152 A.L.R. p. 495:

" 'Early in the nineteenth century it seems to have been the general practice of states to encourage the building of railroads by permitting the state or a subdivision thereof to purchase stock in railroad corporations, to issue bonds or lend credit in aid of railroads, or to make outright donations to them. However, due to the large number of insolvencies of railroads, caused by frauds or economic conditions, states and subdivisions thereof found themselves largely indebted, and were themselves occasionally insolvent because of large investments in such enterprises. Therefore a reversal of policy set in. As early as 1851 Ohio adopted a constitution containing a provision prohibiting stock subscriptions or other forms of aid to corporations. In the ensuing twenty-five years most of the other states adopted similar provisions, either prohibiting aid altogether or requiring a vote of the people before a subscription to stock or other sort of aid could be made or extended. At present, at least thirty-eight states have such constitutional provisions, and several have a statutory provision on the subject.' "

In *Cobb* v. *Parnell, supra,* this Court had before it Act No. 10 of 1931 as amended by Act No. 34 of 1931. By this legislation a board was created consisting of the Governor, the Auditor of State, the Chairman of the Highway Commission. and seven others, designated as

the State Agricultural Credit Board. These acts empowered said board to issue bonds in the sum of $1,500,000, for which the full faith and credit of the State was pledged, for the purpose of financing farmers and stock raisers for agricultural purposes. The loans were to be made by finance corporations, already organized and to be created under the supervision of the State Agricultural Credit Board according to rules prescribing the conditions under which the loans were to be made to the farmers and the manner of repayment. A general annual tax of one-half mill was levied to pay for the bonds.

After reviewing the authorities and setting out the guiding principles as I have attempted to do herein, this question was asked? "Is the purpose and effect of the act now before us a loan by the State of its credit to foster individual enterprises, or is it one which has for its end the accomplishment of a purpose which will secure the State from a general threatened evil and promote the welfare of its citizens? In other words, is it for a public purpose?"

After reviewing the circumstances which called the act into existence — such as the great drought that prevailed in the state throughout the entire growing season of 1930 and the unprecedented economic depression then raging — the court speaking through Mr. Justice Butler said:

"... where a law is enacted for relief from certain starvation and probable disease, certainly it, too, must be but the use of the State's credit for a public purpose. This we so hold as consonant with the impulses of common humanity and natural justice, our conclusions finding support in the authorities we have cited and reviewed. The doctrine announced in this case has no application except in cases where the calamity is certain and irremediable in its nature and general in its scope."

Thus when viewed in the light of the reasons for placing this constitutional restriction on the Legislature, the decisions of this and other courts, I would be compelled, with due deference to, and respect for my colleagues, to hold that Section 19 of Act 567 is void in so far as it permits the State Board of Finance to purchase bonds of the First Arkansas Development Corporation. To the same effect see: *In re Opinion of the Justices,* 99 N. H. 528, 114 A. 2d 514; *contra, City of Frostburg* v. *Jenkins,* 215 Md. 9, 136 A. 2d 852. I can see little difference between the public good claimed by the proponents of this legislation and that claimed by those who sought aid for the railroads, nor any supposed emergency as existed in the case of *Cobb* v. *Parnell, supra.* If the majority opinion is allowed to stand it will strike a terrific blow to private enterprise, a system under which this country has thrived and prospered.

If Scott County Milling Company is permitted to borrow money from the State Treasury for the establishment of private enterprise how could the majority in the future deny the same privilege to any person or private corporation which employs or intends to employ capital or labor. Would not the merchant, the mechanic, the innkeeper, the banker or the builder be equally deserving of the favors of the state.

Is it unreasonable to conclude that such lending would open the coffers of the public treasury to the importunities of two-thirds of the business men in the State? I think not.