2011 Ark. 491

Brett NELSON, M.D., Appellant

v.

ARKANSAS RURAL MEDICAL PRACTICE LOAN & SCHOLARSHIP BOARD, Appellee.

No. 11–369.

Supreme Court of Arkansas.

Nov. 17, 2011.

Kevin P. Keech and Rachel V. Hampton, North Little Rock, for appellant.

Dustin McDaniel, Atty., Gen., Colin R. Jorgensen, Office of Atty. Gen., Little Rock, for appellee.

COURTNEY HUDSON HENRY, Justice.

Appellant Brett Nelson, M.D., appeals the order of the Pulaski County Circuit Court granting summary judgment in favor of appellee Arkansas Rural Medical Practice Student Loan and Scholarship Board (Board) on its breach-of-contract claim arising under the Community Match Loan and Scholarship Program. For reversal, Nelson contends that genuine issues of material fact remain as to his counterclaims and defenses, and he argues that the provisions of Arkansas Code Annotated section 17–95–409(b) (Repl.2010), regarding the suspension of a medical license for the breach of a loan agreement, are not applicable to contracts under the community-match program. We affirm in part and reverse and remand in part.

In 1949, the General Assembly passed Act 131, which created the Arkansas Rural Medical Practice Loan and Scholarship Program that was designed to promote the practice of medicine in rural areas. With the passage of Act 1114 of 1995, the legislature established the community-match scholarship program to remedy the pressing need for additional physicians in rural communities. This program, codified at Arkansas Code Annotated sections 6–81–715–717 (Repl.2003), supplemented the rural-practice program by authorizing a community to provide financial assistance to those medical students interested in engaging in rural community practice.

Under the community-match program, a qualified rural community[1] and the Board enter into joint contracts with accepted applicants to make a loan in the maximum amount of $16,500 per academic year, with the Board and the community each contributing one-half of the loan, unless the Board does not have sufficient funds, in which case the rural community may provide the total loan amount. Ark.Code Ann. § 6–81–716(a)–(b)(1) (Repl.2003). As required by statute, the contract obligates the recipient of a community-match loan to "bindingly contract" to practice primary-care medicine full time in the particular rural community upon the completion of his or her one-year residency or upon the completion of three additional years of medical training beyond internship. Ark. Code Ann. § 6–81–716(c)(1)(A). For each continuous, whole-calendar year of primary-care medical practice, the Board and the rural community are required to cancel, by converting to a scholarship grant, the full amount of one year's loan, plus accrued interest. Ark.Code Ann. § 6–81–716(c)(1)(B).

Another feature of the community-match program applies to alternates on the waiting list for admission to medical school. If an alternate enters into a community-match contract, the alternate is moved to the top of the waiting list. Ark.Code Ann. § 6–81–717(a)(1)(A) (Repl.2003). If an alternate is admitted to medical school under the program and the alternate breaches the contract by failing to engage in the practice of primary-care medicine in the rural community, the alternate is obligated to pay an amount equal to 100% of the loan amount and other unspecified damages, with the minimum amount of damages being equal to the difference between resident and out-of-state tuition for four years

---

1. When Nelson was accepted in the program, the term "rural community" was defined as a community with a health-professions shortage, as determined by the Board, or a community having a population of no more than 15,000 persons. Ark.Code Ann. § 6–81–701(3) (Repl.2003).

of medical school, but not less than $25,000. Ark.Code Ann. § 6–81–717(c).[2] In addition, section 6–81–716(c)(3)(C) states that "the loan contract shall provide for liquidated damages in an amount equal to fifty percent (50%) of the principal of the loan."

The record reveals the following undisputed facts. In March 1997, Nelson was an alternate on the waiting list for admission to medical school for the 1997–98 academic year when he applied with the Board to participate in the community-match program. Conditioned upon Nelson's acceptance to medical school, Nelson, the Board, and the rural community of Forrest City, Arkansas, entered into a one-year loan contract to provide Nelson $16,500 in funds for the 1997–98 academic year. Nelson was advanced on the waiting list, and he achieved admittance to medical school that year. The parties entered into like community-match contracts in the succeeding three academic years. Each of the contracts made reference to the governing statutes, and the contracts set forth the terms and obligations of the parties as required by statute. Over four years, Nelson received $66,000 in loans.

Nelson graduated from medical school in 2003. After completing his internship and residency, he began serving his four-year commitment in June 2007 when he accepted employment at the Forrest City Medical Center Hospital. The hospital did not renew Nelson's employment contract in September 2008, and Nelson left Forrest City to practice medicine in the State of Georgia. Thereafter, Nelson allowed his Arkansas license to lapse, and he no longer holds a license to practice medicine in Arkansas.

In September 2009, the Board filed a complaint against Nelson for breach of contract and, alternatively, unjust enrichment. Nelson answered the complaint, and pleading affirmatively, he alleged that his full performance of the contract was excused based on promissory estoppel; commercial impracticability; fraud in the inducement; unconscionability; frustration of purpose; hindrance of performance; the Board's breach of the implied duties of good faith and fair dealing; and the unenforceability of the penalty provisions in the contracts, as being vague and in violation of public policy. He also asserted counterclaims for breach of the implied duties of good faith and fair dealing; promissory estoppel; and the violation of the Arkansas Deceptive Trade Practices Act.[3] The underlying theme of Nelson's claims and defenses was that he entered the contracts based on the assumption that Forrest City was a medically under-served area but that there proved to be no need for his services. Nelson alleged that the lack of need was due to the saturation of doctors in the area as a result of the Board's approval of a disproportionate number of community-match scholarships for Forrest City. Nelson also asked for declaratory judgment as to whether the suspension provisions of Arkansas Code Annotated section 17–95–409(b) were applicable to any of his contracts.

In February 2010, the Board filed a motion to dismiss Nelson's counterclaims for breach of the implied covenant of good faith and fair dealing and for promissory estoppel. By this motion, the Board did

2. In 2007, the General Assembly repealed the community-match program, and replaced it with a recruitment program directed toward Arkansas medical school graduates instead of students. *See* Act 1058 of 2007.

3. Ultimately, Nelson did not pursue the claim for a violation of the Deceptive Trade Practices Act.

not claim that the material facts were undisputed. Instead, the Board asserted that it was entitled to judgment as a matter of law because ordinary contract principles do not apply to community-match contracts because the agreements are based on statutory directives and are not the product of arms-length negotiation. As support for this proposition, the Board referenced decisions of federal courts pertaining to contract disputes under the National Health Services Corps Scholarship Program (NHSC). In response, Nelson argued that the federal decisions were not persuasive authority due to distinctions between the statutory scheme of the community-match program and the federal scholarship program. On June 9, 2010, the circuit court entered an order denying the Board's motion to dismiss Nelson's counterclaims.

Thereafter, Nelson filed a motion for partial summary judgment on his claim for declaratory relief that his medical license was not subject to suspension as a consequence of any breach of contract. In support of this motion, Nelson argued that the suspension provisions of Arkansas Code Annotated section 17–95–409(b) apply only to contracts under the rural-practice program but not the community-match program. In its response to the motion for partial summary judgment, the Board maintained that Nelson lacked standing to seek declaratory relief and had failed to raise a justiciable issue because Nelson no longer had a license to practice medicine in Arkansas. The Board also contended that Nelson's argument concerning statutory construction was flawed.

While Nelson's motion was pending, the Board filed a cross-motion for summary judgment. The Board asserted that the facts were not in dispute that Nelson breached the loan contracts by failing to fulfill his obligation to serve the remaining three years in primary-care practice in Forrest City. By affidavit, the Board offered proof that, after giving Nelson credit for one year of service, the principal balance owed on the loan was $49,000 with accrued interest of $35,152.46. The Board also claimed entitlement to $49,000 in liquidated damages and unspecified damages of $29,592 for a total sum of $163,744.46. In its brief supporting the motion, the Board incorporated by reference its previous motion to dismiss and accompanying brief to reassert its contention that ordinary contract principles have no bearing on the litigation.

In opposing the motion, Nelson argued that questions of material fact remained regarding his defenses and counterclaims. Nelson asserted that the Board breached the implied duties of good faith and fair dealing by failing to monitor the number of community-match loan recipients in Forrest City such that there was no longer a shortage of doctors in the community. He also asserted that the Board was estopped from claiming that he breached the contracts because the Board fostered in him the understanding that there was a need for medical services in Forrest City and that in entering the contract he detrimentally relied on the Board's representations of need. Nelson further contended that the lack of need for his services frustrated the purpose of the contract and made completion of the contract commercially impracticable. Finally, he argued that the unequal bargaining power between him and the Board rendered the contract unconscionable. In his affidavit, Nelson stated that, when he signed the contracts, he was led to believe that there was a great need for his services in Forrest City and that he was given the impression that he would be employed at the local hospital and would not be required to start his own practice. He stated that his termination from the hospital was occasioned by the

lack of need for his services and had nothing to do with the quality of his performance. Finally, Nelson averred that it was unlikely that he would have entered into the contracts had he been given accurate information about the actual need for his services or had he known that the suspension of his license was a potential consequence of not completing his four-year obligation.

Nelson also presented the affidavits of Jeff Jennings, Chris Brainard, and Dr. Walter Davis in resisting the Board's cross-motion for summary judgment. Davis stated that there was a low need for full-time physicians in Forrest City during Nelson's tenure and that the hospital declined to renew Davis's contract based on the lack of need for his services. Brainard, the marketing director for the hospital, stated that there was a low need for full-time physicians during the time that he worked with Nelson. Jennings, the CEO of the hospital, also stated that there was an extremely low need for full-time positions in the community when Nelson practiced there.

On November 23, 2010, the circuit court entered an order of summary judgment. In this order, the court denied Nelson's motion for partial summary judgment and granted the Board's cross-motion for summary judgment. The court granted judgment to the Board in the principal amount of $49,000, plus accrued interest of $35,152.46, and liquidated damages of $49,000, for a total judgment of $133,152.46. Following Nelson's motion for the entry of final judgment, the circuit court issued an order dated February 1, 2011, restating its previous decision and also dismissing Nelson's counterclaims. Nelson filed a timely notice of appeal from the final judgment on February 14, 2011.

▌₈This case comes to us from an order of summary judgment. The law is well settled regarding the standard of review used by this court in reviewing a grant of summary judgment. *Crockett v. C.A.G. Invs., Inc.*, 2011 Ark. 208, 381 S.W.3d 793. A trial court will grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. *Id.* On appeal, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party leave a material question of fact unanswered. *Bryan v. City of Cotter*, 2009 Ark. 172, 303 S.W.3d 64. We also view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Harrisburg School Dist. No. 6 v. Neal*, 2011 Ark. 233, 381 S.W.3d 811.

First, Nelson challenges the circuit court's decision to grant summary judgment to the Board on its claim for breach of contract. Nelson contends that genuine issues of material fact remain in dispute with regard to his counterclaims for breach of the implied duties of good faith and fair dealing and promissory estoppel and his defenses of frustration of purpose, commercial impracticability, and unconscionability. In reply, the Board does not take issue with Nelson's contention that questions of fact remain unanswered as to his claims and defenses. Instead, the Board urges us to affirm on the ground that ordinary contract principles, such as those asserted by Nelson, do not apply when the terms of a contract are governed by statute. The Board's position that common-law-contract principles are not relevant is supported by a number of federal courts that have addressed the issue in breach-of-contract actions brought by the federal government under the aforemen-

tioned NHSC, which is also designed to recruit medical students to serve in areas where there are a shortage of doctors. *See United States v. Vanhorn,* 20 F.3d 104 (4th Cir.1994) (ordinary contract principles do not apply to NHSC contracts); *United States v. Becker,* 995 F.2d 779 (7th Cir. 1993) (statutory intent is more relevant in interpreting NHSC conditions than common-law contract principles); *United States v. Arron,* 954 F.2d 249 (5th Cir. 1992) (conditions imposed upon NHSC scholarship recipients arise from statute and not negotiated agreement; thus, statutory intent and not contract principles govern interpretation of those conditions); *United States v. Melendez,* 944 F.2d 216 (5th Cir.1991) (contractual remedies are irrelevant in NHSC scholarship action); *United States v. Hatcher,* 922 F.2d 1402 (9th Cir.1991) (obligations under the NHSC program are not governed by contract principles); *Rendleman v. Bowen,* 860 F.2d 1537 (9th Cir.1988) (conditions of the NHSC program do not arise from negotiated agreement; therefore, statutory intent is more relevant than common-law contract principles); *Singer v. Dep't of Health & Human Servs.,* 641 F.Supp.2d 1219 (D.Utah 2009) (ordinary contract defenses do not apply to NHSC contracts because the contracts are creatures of statute; thus the only relevant facts are those that are material in the statutory framework); *United States v. Bloom,* 925 F.Supp. 426 (E.D.La.1996) (contract defenses not applicable because the relationship is statutory, not contractual); *United States v. Hugelmeyer,* 774 F.Supp. 559 (D.Ariz.1991) (contract defenses inapplicable because statutory intent governs rather than contract principles).

■ This body of law represents the various federal courts' interpretation of Congressional intent with regard to the federal program. Notwithstanding these authorities, it has long been the rule in Arkansas that, although the General Assembly has the power to alter the common law, a legislative act will not be construed as overruling a principle of common law unless it is made plain by the act that such a change in the established law was intended. *See Thompson v. Bank of Am.,* 356 Ark. 576, 157 S.W.3d 174 (2004); *Books–A–Million, Inc. v. Ark. Painting & Specialties Co.,* 340 Ark. 467, 10 S.W.3d 857 (2000); *Hartford Ins. Co. v. Mullinax,* 336 Ark. 335, 984 S.W.2d 812 (1999); *Starkey Constr., Inc. v. Elcon, Inc.,* 248 Ark. 958, 457 S.W.2d 509 (1970); *Barrentine v. State,* 194 Ark. 501, 108 S.W.2d 784 (1937); *Gray v. Nations,* 1 Ark. 557 (1839). Therefore, our inquiry must focus on the language of our own particular statute. Section 6–81–716 sets out the terms of the loan agreement. Even so, the statute reveals no clear expression of legislative intent to deprive community-match-scholarship recipients of the ability to assert common-law claims and defenses. Because the statute does not plainly override common law, Nelson is entitled to assert claims of his own and to mount a defense against the Board's breach-of-contract action. As questions of fact remain as to these claims and defenses, we reverse the grant of summary judgment to the Board and remand for proceedings consistent with this opinion.

■ For his second issue, Nelson argues that the suspension provisions of section 17–95–409(b) do not apply to community-match contracts. As advanced in his counterclaim for declaratory judgment, Nelson contends that section 6–81–716 contains no reference to the suspension of a license upon breach of a community-match contract, whereas by contrast, the statute applicable to the rural loan program, Arkansas Code Annotated section 6–81–708(c)(2)(A) (Supp.2010), does contain

a suspension provision. Therefore, Nelson argues, the suspension provisions contained in section 17–94–409(b) do not apply to a community-match loan. We agree with the Board's argument made below that Nelson lacks standing and fails to present a justiciable controversy on this issue because he does not hold a license to practice medicine in Arkansas.

■■ Only a claimant who has a personal stake in the outcome of a controversy has standing. *Chubb Lloyds Ins. Co. v. Miller County Circuit Court*, 2010 Ark. 119, 361 S.W.3d 809; *Pulaski County v. Arkansas Democrat–Gazette, Inc.*, 371 Ark. 217, 264 S.W.3d 465 (2007). The question of standing is a matter of law for this court to decide, and this court reviews questions of law de novo. *McLane Southern, Inc. v. Arkansas Tobacco Control Bd.*, 2010 Ark. 498, 375 S.W.3d 628.

■ Declaratory judgments are used to determine the rights and liabilities of respective parties. *See Stilley v. James*, 345 Ark. 362, 48 S.W.3d 521 (2001). The purpose of the declaratory-judgment statutory scheme "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Ark.Code Ann. § 16–111–102(b) (Repl.2006). Pursuant to Ark.Code Ann. § 16–111–104 (Repl.2006),

[a]ny person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

This court has observed that, in order to obtain declaratory relief, the requisite precedent facts or conditions generally held to be required include:

(1)[A] justiciable controversy, that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy; in other words, a legally protectable interest; and (4) the issue involved in the controversy must be ripe for judicial determination.

*MacSteel Div. of Quanex v. Arkansas Oklahoma Gas Corp.*, 363 Ark. 22, 35, 210 S.W.3d 878, 886 (2005) (quoting *Andres v. First Arkansas Dev. Fin. Corp.*, 230 Ark. 594, 606, 324 S.W.2d 97, 104 (1959)). As we said in *Cummings v. City of Fayetteville*, 294 Ark. 151, 154–155, 741 S.W.2d 638, 639–640 (1987):

The Declaratory Judgment Statute is applicable only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented. It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A declaratory judgment will not be granted unless the danger or dilemma of the plaintiff is present, not contingent on the happening of hypothetical future events; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote.

■ Nelson no longer possesses an Arkansas medical license because he allowed it to lapse. As such, he has no standing to seek a determination of whether a community-match-loan recipient could face the suspension of his or her license for breaching a contract. In essence, Nelson is seeking a legal opinion from this court rather than the resolution of an actual controver-

sy. However, it is well settled that we will not issue an advisory opinion. *Brown v. Kelton,* 2011 Ark. 93, 380 S.W.3d 361; *Jewell v. Fletcher,* 2010 Ark. 195, 377 S.W.3d 176. Therefore, we do not decide this issue.

Affirmed in part; reversed and remanded in part.